JOHN QUINN

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Mt. Vernon January 20, 1888.*

1. CRIMINAL LAW—*larceny of a horse—under what section of the Criminal Code the indictment properly framed.* An indictment for the larceny of a horse is properly framed under section 215 of the Criminal Code, which defines the offence substantially as at common law, and not under section 224. The latter section does not define or create the offence, but simply fixes the punishment for horse stealing, and therefore operates as a limitation on section 216, which defines the punishment for larceny generally.

2. SAME—*larceny of an estray—in whom to lay the ownership.* In the case of the larceny of a horse while in the hands of one who had taken the horse up as an estray, the indictment may properly lay the ownership of the horse in the true owner, or in the person who held the animal as an estray. The interest of the taker of an estray animal, as against the true owner, is the posting fees and other lawful charges in his favor, but as against a wrongful taker it is the full value of the estray.

3. SAME—*facts of case showing larceny.* Two persons acting in concert, went to the house of the holder of an estray horse, one of them claiming to be the owner, and asked for it. The holder refused to give up the animal, and by agreement brought it the next day to town and saw such parties, who paid him his charges, and by his leave they were allowed to take the horse to the livery stable, to be fed. The party holding the horse did not intend to give it up until proof of ownership was made, and waited for the other two to come and furnish such proof. Instead of taking the animal to be fed and of returning to make the proof, they took it to an adjoining county, where they traded it for another horse. The claim of ownership was a mere pretense to get possession, and a fraud, and the facts showed that the holder of the estray never intended to surrender full possession and all claim to the animal until proof of ownership was made: *Held,* that the facts showed a larceny on the part of both the parties so obtaining the horse.

4. SAME—*evidence of felonious intent—subsequent acts.* Where a person is charged with larceny in obtaining an estray horse by fraud and false representations, it is proper to show, as having a bearing upon the question of felonious intent, what he and his accomplice did with the horse after getting possession of it, and there is no error in an instruction calling the attention of the jury to such acts.

5. SAME—*larceny and embezzlement, as distinct offences.* Nothing which is made larceny at common law can be embezzlement under our statute, so that a person can not be convicted under an indictment for both offences, in respect to the same property or transaction.

6. PRACTICE—*improper remarks to jury by State's attorney—as to accused not testifying in his own behalf.* On the trial of one for larceny and embezzlement, the assistant of the State's attorney, in the closing argument, referred to the fact that the defendant failed to go upon the witness stand and deny certain things claimed to have been proven by the prosecution. On objection being made, the court stopped the counsel, and told the jury that his remarks were improper: *Held,* that the remarks of counsel were such an error as required a reversal of the judgment of conviction, and that the error was not cured by the statement of the court to the jury.

7. ERROR WILL NOT ALWAYS REVERSE—*misdirection as to finding under different counts in an indictment.* On the trial of one under an indictment charging the larceny of a horse, and also the embezzlement of a horse, the court instructed the jury, that if they found the defendant guilty, to specify under which count, and to fix the punishment at confinement in the penitentiary for not less than three nor more than twenty years. The jury found the accused guilty under the count charging larceny, and fixed the punishment at confinement in the penitentiary at ten years: *Held,* that as the jury found the defendant guilty of larceny, and not of embezzlement, there was no such error in the instruction as worked any injury to the defendant.

8. INSTRUCTION—*should be based on the evidence, rather than the pleadings.* An indictment charged the larceny of "a certain horse," without stating its color, but the evidence showed it was a roan horse: *Held,* that there was no error in an instruction because it referred to the horse as a "certain roan horse mentioned in the indictment," as an instruction should be based on the evidence rather than the pleadings.

9. SAME—*as assuming a fact.* The assuming of a fact in an instruction, which stands proved and is wholly undisputed, or which both parties assume to be true, is no ground for the reversal of a judgment in a criminal case, for the reason it can work no prejudice to either party.

10. SAME—*referring to facts relied on.* While there is danger of committing a mistake in preparing an instruction which embodies a general summary of the facts relied on by a party, and upon which the court is asked to pronounce the law, yet when such an instruction is properly framed there will be no error in giving the same.

WRIT OF ERROR to the Circuit Court of Saline county; the Hon. C. S. CONGER, Judge, presiding.

Mr. W. H. BOYER, Mr. F. M. YOUNGBLOOD, and Mr. ALBERT WATSON, for the plaintiff in error:

To sustain the conviction under the second count, required, among other things, proof of ownership and possession in Straub of the identical property described in the indictment, and a felonious intent of taking the same, by the defendant, from the possession of Straub.

Where it appears, from the evidence, as here, that the owner parted with the possession of the property to the person charged, voluntarily, and as a result of negotiation between them touching the ownership, the People must further show, beyond a reasonable doubt, that at the time the possession was changed the owner did not intend to part with whatever interest he had at the time. Straub, on receiving $6.75, the extent of his claim or interest in the horse, voluntarily delivered possession of the horse to Monroe, coupled with no condition as to return or making proof of ownership.

There can be no trespass, and consequently no larceny, when there is a consent to the taking, even though such consent is obtained by fraud. 2 Bishop on Crim. Law, secs. 817, 822, 823, 838.

The comments of the assistant State's attorney upon the defendant's failure to testify, is such a violation of the statute and the rights of the accused as to call for a reversal. Rev. Stat. chap. 38, sec. 486.

The court erred in giving instructions for the prosecution, especially that as to the time of the punishment in the penitentiary, fixing the same at not less than three years. Embezzlement is made larceny, and the punishment for larceny is fixed at not less than one year in the penitentiary. The second count charged horse stealing, which is a distinct offence from larceny. *Hoge* v. *People,* 117 Ill. 49.

The second of the People's instructions assumes things to have been proven which ought to have been left to the jury

to find.    It tells the jury that the horse mentioned in the indictment was a certain roan horse, when, in fact, the indictment contains no such description.    It assumes that Straub was in possession of the horse.    It further tells the jury, "that if you believe that defendant and such other party took said horse from Saline county to Franklin county, and then and there disposed of said horse, as his own property, to one Hindman, with a felonious intent to convert said horse, etc., then such taking would be larceny, as charged in the second count." That count charged the felonious taking to have been in Saline county, and yet this instruction told the jury that they would be warranted in convicting, upon proof that the taking was in Franklin county. .

Mr. GEORGE HUNT, Attorney General, and Mr. J. J. PARISH, State's Attorney, for the People:

The People's three instructions, taken together, presented the law applicable with the utmost fairness, whether Straub actually parted with the title and possession of the horse not expecting its return, and are in harmony with the defendant's instructions, and with the views of this court in *Johnson* v. *People*, 113 Ill. 99.

The indictment being for the larceny of a horse, we are at a loss to discover wherein the instruction, as to the extent of the punishment, is objectionable.

With regard to the allusion made by the attorney who assisted in the prosecution, to the fact that the defendant had failed to testify, we have only this to say: that it was purely accidental, was promptly stopped at its beginning, and condemned by the court.    We insist that the evidence of the defendant's guilt was so plain, palpable, connected, conclusive and overwhelming, that this court must be convinced that the comments complained of did not harm him, and that the judgment ought not for that reason to be reversed.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

At the September term, 1887, of the Saline circuit court, John Quinn was tried, convicted, and sentenced to the penitentiary for ten years, on a charge of larceny and embezzlement, and the record of his conviction is now before us for review. The subject of the alleged larceny and embezzlement was a certain horse, the property of Sylvester Whitehead, a resident of Johnson county, which had been taken up as an estray by Stephen Straub, in the adjoining county of Saline. The indictment contains four counts. The first two are for larceny, the other two for embezzlement. The first and third lay the property in Whitehead, the second and fourth lay it in Straub. The defendant was convicted of larceny on the second count.

It appears, from the evidence, that while the horse was in the possession of Straub, as an estray, the accused, and a young man by the name of Monroe, went to Straub's house, a few miles distant from Harrisburg, the county seat, called for the horse, claimed him as the property of Monroe, and proposed to take him away. Straub would not consent to this, but agreed to meet them next morning, with the horse, at Harrisburg, for the purpose of settling the matter. The parties accordingly met next morning in Harrisburg, at the hotel where Quinn and Monroe had stayed over night, Straub being accompanied by his wife, and having the horse with them. After some conversation between the parties, and the payment by Quinn to Straub of $6.75, amount of charges claimed to be due on account of the posting of the horse, Quinn and Monroe, without making any proof of their claim, succeeded in getting possession of the horse, and took him over into Franklin county, where they swapped him to William Hindman for another.

As the accused was convicted upon the second count, which charges the property in Straub, it will only be necessary to

notice the evidence so far as it relates to that count, and, as it is confined within very narrow limits, it will be more satisfactory to set it out in its entirety. It consists mainly of the testimony of Straub and witness Warfield. The substance of it is stated in the abstract, as follows:

Stephen Straub—"Live south-east of Harrisburg, and lived there in November, 1884. At that time I took up and posted a roan horse with four white feet. * * * In the fall of 1885 two men came to my house after the horse. I showed the horse to them. The young man went up to the horse, and said, 'This is my horse,' etc. Quinn said they would have to take the horse off. ' * * * I told them I would bring the horse to town next morning. My wife and I brought him here next morning, and went to Warfield's house and asked him where the men were. He said they were at the hotel, and we took the horse to the hotel. The men were eating their breakfasts. We then went to Baker's corner with the horse, and soon after the two men, Quinn and the young man, came where we were, and asked us what the expenses of posting the horse had been. My wife told him, $6.75. The young man asked Quinn to pay the money, which he did, paying my wife $6.75. The young man asked if the horse had been fed this morning. She said no. He asked if we would object to taking him to the livery stable and having him fed. She said no. They went off towards the livery stable. We went to Warfield's office, and waited an hour or two for him to come. When Warfield came he said they must file affidavits, and we then went to the livery stable, and the men were gone." Cross-examination: "The men paid my wife for taking the horse up. The young man requested Quinn to pay the charges for him. They said nothing to me about proving the horse."

R. N. Warfield—"I remember of old man Straub posting a · horse before me. Had conversation with Quinn, who said he had visited Straub, and he (Straub) agreed, as soon as his wife came home, to bring the horse here, and asked me if Straub

would run the horse off. I told him no. He was a Dutchman, and his wife is the boss and wears the breeches, and when she comes home they would bring the horse in. I prepared affidavits that evening. They were never signed or sworn to. I learned from some one Quinn had stopped at the McFarlin House, on the west side of the square. The next morning Straub and his wife came in about sunrise, with the horse. He and his wife came to my house and wanted affidavits, but I afterwards saw them unhitch the horse from the east side of the square,—I had told them where Quinn was stopping,— and go off in the direction of the McFarlin House. I afterwards went to my office, and found Straub and wife there, and told them they must have the fellows swear to the horse. They then went to the livery stable, and returned and reported them gone."

With the exception of certain facts and circumstances bearing on the question "of felonious intent," this is about all the evidence tending to support the second count in the indictment.

We do not understand, as is suggested by counsel for plaintiff in error, that the offence charged in the second count "is an offence different from that of larceny at the common law," or from that of larceny as defined by the 215th section of the Criminal Code. The indictment in this case is not, strictly speaking, founded upon the 224th section of the Criminal Code, as is supposed by counsel. That section does not attempt to define the crime of larceny. It simply fixes the punishment for horse stealing, and therefore operates as a limitation on section 216, which defines the punishment of larceny. The present indictment is framed under the 215th section of our statute, which defines larceny substantially as it is defined by the common law, and the indictment is clearly for a common law offence. This being so, it follows that the case is to be governed by common law principles.

Upon the evidence before us, we think the jury were justified in reaching the conclusion, as they must have done, that the

accused and the young man who accompanied him to Straub's house were acting in concert, and that the claim there set up to the horse was a mere pretense to cover a deliberate purpose to steal him. Assuming this to be so, it follows that if they had taken the horse without Straub's consent they would have been guilty of larceny, and the property in the horse might well have been laid either in Straub or Whitehead. That the former parted with the temporary custody of the horse, is conceded; but counsel for plaintiff in error insist that there was a change of possession, as contradistinguished from mere custody. Still, this would not be sufficient to exonerate the accused, for the reason the claim to the horse, as found by the jury, was a fraud and pretense, and there was a present purpose to steal him. On the facts, the only plausible ground of defence is, that Straub, in accepting the $6.75, (the amount of charges on the horse,) and permitting the accused to take him from the hotel, thereby intended to part, absolutely, not only with the possession, but with all title and interest whatever in the property,—and such we understand to be the claim of counsel.

If the facts were simply that the horse was brought to the hotel, the money paid over to Straub, the horse unconditionally delivered by him to the accused, and that the latter took him away, there would be much force in the claim that Straub thereby intended to part with all title and claim to the horse. But the case suggested is not the one before us. It is evident Straub knew that no one had the right to take the horse from him without making proof of ownership. He had previously been told by Warfield, the justice, that if any one came after the horse, he would have to be brought to town before he could properly be surrendered, and on this ground, doubtless, Straub refused to let the parties take him, when at his house. The justice states: "The next morning Straub and his wife came in about sunrise, with the horse. He and his wife came to my house, and wanted *affidavits*," etc. It is very clear that

notwithstanding they had received the posting fees, and had consented that the horse might be taken to the stable for the purpose of being fed, they did not intend that the accused and his confederate should take the horse away until they had made the necessary affidavits of ownership. This is conclusively shown by the fact, that after all this had occurred Straub and wife went to the justice's office, and waited an hour or so for him to come, not knowing the accused had already gone with the horse. The latter, also, must have understood that Straub did not intend to part with the horse till the necessary proofs were made, otherwise they would not have asked permission, as they did, to take him to the stable to have him fed. Why did they propose paying the charges on the horse before the proofs were made? Was it to lull Straub and his wife into security, while they, under the pretense of going to the stable to feed the horse, might get away with him? It would have been time enough to pay charges after establishing their claim to him. It is more than likely that Straub and wife regarded this promptness on their part to pay the charges as an evidence of their good faith and purpose to fully comply with the law before taking off the property.

Taking all these circumstances into consideration, we think the jury were warranted in reaching the conclusion, as they must have done, that there was no intention on the part of Straub to part with the horse altogether until after the necessary proofs were made. It is very clear that permission to take the horse to the stable to be fed, which alone was given, conferred no authority to take him anywhere else. The jury must have found he was taken off without Straub's permission or consent, and with the intent to steal him, and we are unable to say that the evidence is insufficient to support this hypothesis.

We do not agree with counsel in assuming that the only interest Straub had in the horse was the posting fees. That would be true as against Whitehead, the real owner, but as

against Quinn and his accomplice his interest was the full value of the horse.

The second instruction given in behalf of the People is complained of. It is as follows:

"If you believe, from the evidence, beyond a reasonable doubt, that in the fall of 1884 Sylvester Whitehead was owner of a certain roan horse mentioned in the indictment, and about the month of November in said year said horse strayed away from its owner, and was afterwards, in said month and year, taken up as an estray by one Stephen Straub, a resident of Saline county, Illinois; and if you further so believe, in the month of September, 1885, while said horse was in the legal possession of said Straub, the defendant and another, in Saline county, Illinois, obtained possession of said horse from said Straub by falsely and fraudulently representing to said Straub that said horse was the property of one of them, with the felonious intent   *   *   *   to feloniously convert the horse to his own use, but that said Straub did not intend to part with his title to said horse; and if you further believe, that defendant and such other party took said horse from said Saline county to Franklin county, and then and there disposed of said horse as his own property, to one Hindman, with a felonious intention to convert said horse, etc., then such taking would be larceny, as charged in the second count in the indictment."

It is objected that this instruction is erroneous, in referring to the horse charged to have been stolen, as a "certain *roan* horse," when he is not so described in the indictment. We perceive no force in this objection. It is true the indictment does not state the color of the horse, nor was it necessary to do so. The evidence, however, does show him to have been a "roan" horse, and as instructions should always be based on the evidence rather than the pleadings, there was no impropriety in referring to the horse as described in the evidence.

It is further objected, that the instruction "assumes that Straub was in possession of the horse." We do not so read the instruction. But even if this were so, it would afford no ground of complaint, because his possession was an undisputed fact, and the evidence was conclusive and all one way on that subject; hence the defendant could not have been prejudiced on the ground suggested. Courts never reverse for an error that works no injury. Besides, this complaint is inconsistent with the main defence relied on. The accused urges, with great persistence, that Straub voluntarily surrendered to him the possession of the horse, together with all interest in him. This, of course, he could not have done unless the possession of the horse had been in Straub. Under these circumstances the court might well have treated the possession of the horse by Straub as a matter about which both parties were agreed.

It is finally objected, that this instruction told the jury, in effect, that they might find the defendant guilty under the second count in the indictment, upon satisfactory proof of the conversion of the property in Franklin county. A careful reading of the instruction, we do not think, justifies the construction which counsel have placed on it, though it is not as perspicuous, in this respect, as it might have been. There is embodied in it a general summary of the material facts relied on for a conviction, and the court, in conclusion, is asked to pronounce the law upon this summary of the facts as set forth in the instruction. While there is always more or less danger of committing a mistake in preparing instructions of this kind, yet when properly framed they have often received the approval of this court. It was proper to show, as bearing upon the question of felonious intent, what the parties did after getting possession of the horse, where they went, and what disposition they made of the horse. This was done, and we see no impropriety of referring to the fact and place of the sale,—whether it occurred in Franklin, Saline, or any other county. It will be seen, by carefully examining the instruc-

tion, that it does not tell the jury that the conversion or trans-
fer of the horse in Franklin would be larceny, but that "*such
taking*" would be larceny,—that is, the taking of him from
Straub, under all the circumstances recited in the instruction,
including the swapping of the horse in Franklin, "would be
larceny."

Believing, as we do, the inartificial manner in which this
instruction is drawn could not have misled the jury, the ob-
jections to it should not prevail to the extent of requiring a
reversal.

Exceptions are also taken to the fourth instruction. It is
as follows:

"The court instructs the jury, if you find the defendant guilty,
you should specify, in your verdict, upon what count of the
indictment, and the form of your verdict may be, 'We, the jury,
find the defendant guilty as charged in the ―― count of the
indictment, and we fix his punishment at imprisonment in the
State penitentiary for the term of ―― years,' (not less than
three nor more than twenty years,) or, if you find the defend-
ant not guilty, the form of your verdict may be, 'We, the jury,
find the defendant not guilty.'"

By the 115th section of the Criminal Code it is provided, that
"whoever embezzles or fraudulently converts to his own use
* * * money, goods or property delivered to him which
may be the subject of larceny, or any part thereof, shall be
deemed guilty of larceny," and the punishment for larceny,
where the value of the property taken is over $15, is fixed by
the 216th section at confinement in the penitentiary *not less
than one* nor more than ten years. But the punishment for
stealing a horse is fixed by the 224th section at confinement in
the penitentiary *not less than three* nor more than twenty years.
Now, it is urged against the instruction, that assuming the jury
had been of the opinion the defendant was guilty, under one
of the counts, for embezzlement, and had desired to fix the
punishment at something less than three years, as counsel

claim they might have done under a proper construction of the above sections of the statute, yet, by the instruction, they were not permitted to do so. This objection is evidently based upon the hypothesis that there is a difference in the punishment for the larceny of a horse and the embezzlement of one. It is not necessary to express any opinion on this question, as it is evident the instruction could have worked no injury to the accused, as the jury found the defendant guilty of larceny, and it conclusively shows they could not legally have found him guilty of embezzlement, for the reason that nothing which is larceny at the common law can be embezzlement under the statute. (*Kibs* v. *The People*, 81 Ill. 599.) Again, as the only objection to the instruction is, that it did not permit the jury to fix the punishment at less than three years, it is manifest the accused was not prejudiced by it, for the additional reason that the punishment is much greater than that limited by the instruction. If the punishment had been fixed by the jury at three years, the lowest they could have imposed, under the instruction, then, assuming the construction contended for is correct, there would be much force in the objection; but since the punishment, as fixed by the jury, is more than three times greater than the *minimum* fixed by the instruction, we perceive no force in the objection.

So far no serious difficulty has been encountered in the consideration of this case. It remains, however, to consider an objection of a more serious character. It is claimed by the prisoner, that in the conduct of the trial, his rights, under the constitution and laws of the State, were violated and disregarded. It is clear that whenever a trial is so conducted as to deprive the accused of any substantial right, he has not had a fair trial, within the meaning of the constitution, and a trial which is not fair is not only violative of common right, but is contrary to the spirit and genius of our free institutions. It is also a reproach to the courts that permit it, and a blot upon the jurisprudence of the State.

An uncontradicted affidavit in the bill of exceptions contains the following statement: "That W. H. Parish, Jr., who was associated with the State's attorney in the prosecution of defendant in this cause, did, on the argument made by him for the People in said cause, after the evidence was closed, refer to and comment on the fact that the defendant had not testified in his own behalf on the trial of said cause; and after enumerating several material facts which he claimed the People had proven, and which he said were true, he then said, in his argument, 'If this is not true, what did they have John Quinn here for?—why did he not go on the witness stand and deny it?'—which was objected to," etc.

The 486th section of the Criminal Code, which gives the accused the right to testify on his own behalf, contains this proviso: "*Provided, however,* that a defendant in any criminal case or proceeding, shall only, at his own request, be deemed a competent witness, and his neglect to testify shall not create any presumption against him, *nor shall the court permit any reference or comment to be made to or upon such neglect.*" In giving a construction to this section of the statute, and earnestly endeavoring to enforce it in its true spirit and intent, this court has spoken in no uncertain tones. The cases of *Baker* v. *The People,* 105 Ill. 452, *Austin* v. *The People,* 102 id. 261, and *Angelo* v. *The People,* 96 id. 209, (the only ones we have been able to find where the subject has been before us,) were all reversed for a violation of this provision of the statute. In the *Austin case,* it is true, two of the members of the court dissented, but on the distinct ground that they regarded the reference made by the State's attorney to the fact that the accused had failed to testify as a witness in his own behalf, as a legitimate reply to the argument of counsel for defence. The case was a prosecution for rape, and the defendant's attorney had alluded to the remarks of Lord Hale about the difficulty of defending against a charge so easily made, and it was in reply to this that the People's counsel said that this

difficulty did not exist in that case, because the defendant had the right to go on the stand as a witness, if he desired to avail himself of it, or words to that effect. Notwithstanding this was really a pertinent reply to the opposing argument, outside of the fact the statute prohibited it, a majority of the members of the court, believing it would be dangerous to permit the subject to be referred to at all, voted to reverse the case, and it was accordingly reversed. The court was unanimous in reversing the other two cases. There is not a mitigating circumstance in this case,—if, indeed, there could be such a thing,—that was not in the others. It is true the court, upon the objection being made, stopped counsel, and told the jury that his remarks were improper; and this, together with the claim that the remarks were unthoughtedly made in the heat of discussion, is all that is urged in palliation of the positive violation of the statute. How much did it avail for the court to tell the jury that the remarks of counsel were improper? His words had found a lodgment in the minds of the jury, spent their force and subserved the purpose for which they were uttered, and it were idle to talk about removing their effect upon the jury by a mere declaration from the court that they were improper. As well might one attempt to brush off with the hand a stain of ink from a piece of white linen. One, in the very nature of things, is just as impossible as the other. The present case, in this respect, is "on all fours" with that of *Angelo* v. *The People, supra,* and everything urged here by way of extenuation is fully met by what is said in that case, and it is therefore unnecessary to repeat it again. In respect to the general principles of law applicable to this case, upon the facts, we refer to *Johnson* v. *The People,* 113 Ill. 99.

For the error last discussed, the judgment of the court below is reversed, and the cause remanded for further proceedings in conformity with this opinion.

*Judgment reversed.*

Mr. JUSTICE MAGRUDER, dissenting:

I do not concur in the reversal of the judgment in this case for two reasons. *First*, the court ruled, in the presence of the jury, that the objectionable statement made by the counsel for the prosecution was improper.    Counsel for defendant objected "to any reference being made to the fact that the defendant did not testify."    In ruling upon this objection, the trial judge said: "The objection is sustained—it is improper to make any reference to the fact of the defendant failing to testify."    Any harm, which the language of the prosecuting attorney may have done, was counteracted by the emphatic utterance of the court.    *Second*, in *Austin* v. *The People*, 102 Ill. 261, this court said "that such improper and forbidden reference by counsel for the prosecution shall be regarded good ground for a new trial in all cases where the proofs of guilt are not so clear and conclusive, that the court can say affirmatively the accused could not have been harmed from that cause."    The record and the opinion of the majority show, that the proofs of guilt of the plaintiff in error in this case are so clear and conclusive that he could not have been harmed by the language objected to.