## The People v. Joseph Evans.

*Criminal law—Indorsing names of witnesses upon information—Continuance—Jury—Challenges for cause—Rape—Evidence—Character of respondent—Conduct of prosecutor—Charge to jury—Defective return of justice—Plea in abatement.*

| | |
|---|---|
| 72 | 367 |
| 81 | 437 |
| 72 | 367 |
| 85 | 456 |
| 72 | 367 |
| 89 | 76 |
| 72 | 367 |
| 108 | 658 |
| 72 | 367 |
| 118 | 299 |
| 72 | 367 |
| 139 | 340 |
| 72 | 367 |
| 151 | 127 |

1. The court may properly permit the prosecuting attorney to indorse the name of the complaining witness, whose testimony was taken on the preliminary examination, upon the information after the jury is sworn, he having failed to make such indorsement through inadvertence; but if the respondent makes a reasonable claim that he is not prepared to meet the testimony expected to be given by said witness, he should be allowed a reasonable time to prepare his defense.

2. Where on the trial of a father for an alleged rape upon his daughter the name of the daughter is indorsed upon the information as a witness after the jury is sworn, the request of the respondent for a continuance over the term should be granted, he claiming to be unprepared to meet her testimony; and it is error to continue the case for a number of weeks, and allow the jury to separate and return and try the case, the respondent not consenting to such continuance, and objecting to said trial.

3. Where, after a jury is sworn, the case is continued for some weeks, and the jury allowed to separate, and on their re-assembling the respondent is permitted to challenge jurors for cause, a challenge to a juror who admits that he has heard some talk about the case upon both sides, which he could not narrate, having heard so many stories, but that he had heard people talking about the public sentiment about the case, in which conversations he took no part, and did not think he had been influenced thereby, should be allowed.

4. Where, in such a case, one of the jurors denied stating to a certain person, since the continuance of the case, that he believed that the respondent was guilty, the respondent should be allowed to call the person named to establish the fact, and if, after hearing his evidence, the court entertains any doubt on the subject, a challenge for cause should be sustained.

5. Where, on the trial of a father for an alleged rape upon his

daughter, she is the sole witness for the prosecution, and is contradicted by the father, and does not deny having stated to third parties that the charge sworn to was untrue, they having testified to such statements by her, evidence of her having repeatedly made similar accusations against her brothers and other persons, and afterwards admitted their falsity, is admissible, as tending to show a morbid condition of mind or body, and as explaining the charge made against the father.

6. The failure of a respondent to offer affirmative evidence of his good character raises no legal inference that he is guilty of the offense charged, or that his character is bad, and it is the gravest error for the court to permit the prosecuting attorney to comment upon the absence of · such testimony, which is not cured by an instruction to the jury not to consider such argument.

7. This Court has upon numerous occasions been called upon to express its opinion upon the conduct of prosecuting officers in the prosecution of criminal cases, and has often laid down the rule that it was their duty, as well as the duty of the court, to see that the accused had a fair and impartial trial. They are not the attorneys of the complaining party, but represent the people, who are as much interested to protect the innocent as in the conviction of the guilty.

8. It is error for the court, on the trial of a respondent for rape, where the whole theory of the defense is that the charge of the prosecutrix is fabricated, to instruct the jury upon the theory that the respondent claims a want of sufficient resistance on her part to constitute the offense, as shown by her failure to make an outcry or resistance at the time, or complaint afterwards, which evidence was drawn out upon her cross-examination.

9. Until the examining magistrate has determined that an offense, not cognizable by a justice of the peace, has been committed, and that there is probable cause to believe the respondent guilty thereof, and has so certified to the circuit court, the prosecuting attorney has no authority to file an information, and a return by order of the court, made after such filing, will not give the court jurisdiction to proceed on said information.

Error to Alcona. (Simpson, J.) Argued October 17, 1888. Decided November 1, 1888.

Respondent was convicted of rape. Conviction set aside

and respondent discharged. The facts are stated in the opinion.

*Frank Emerick,* for respondent.

*Moses Taggart,* Attorney General, and *W. E. Depew,* Prosecuting Attorney, for the people.

[The points of counsel and authorities are fully covered by the opinion.—REPORTER.]

LONG, J. The respondent is charged with the crime of rape, committed upon his daughter, Rose Evans, on September 20, 1885, at Harrisville, Alcona county; and upon his trial in the circuit court for said county, April 5, 1888, was found guilty of the offense charged.

Upon his arraignment in the circuit court, under the information then filed, he interposed a plea in abatement, which was overruled by the court. The record shows the following facts as to what took place in court after such plea was overruled: February 14, 1888, the respondent being present, and trial ordered, thereupon came a jury, etc., who were duly impaneled, tried, and sworn, etc.; February 15, the jury heretofore impaneled in this cause came and sat together; and thereupon, on motion of the court, and by consent of counsel, cause adjourned until the next morning at 9 o'clock. February 16, the jury impaneled in this cause came and sat together, and upon motion of counsel for respondent, and upon consent of counsel for the people, the further proceedings were postponed until April 4, 1888, at 9 o'clock in the forenoon. April 4, the jury heretofore impaneled in this cause came and sat together, and heard the proofs and allegations of the parties in part. April 5, 1888, the jury found the respondent guilty.

It further appears that on the 14th of February, 1888,

when the cause was called for trial and jury impaneled, the prosecuting attorney opened his case to the jury by making a statement of the people's case, and what he expected and intended to prove by the witnesses; at the conclusion of which statement he called as a witness for the people Rose Evans, the daughter of the respondent. Counsel for the respondent made objection to her being sworn, on the ground that her name was not indorsed on the information.    The prosecuting attorney then stated to the court:

" It seems her name is not on the information, and I did not know it until now, but I knew the case could not proceed without her testimony."

The prosecuting attorney was permitted to indorse the name of the witness on the information, at the same time the court stating to the counsel for the respondent:

" If the defendant desires time to meet any surprise, if there is any, he can have it."

Counsel for respondent then asked the court that the cause be continued until the next term.    This the court refused, but continued the case until April 4, 1888.    It does not appear from this part of the record that respondent's counsel consented to have the case set for this time, though the order entered in the court journal shows that this adjournment or continuance was had on motion of respondent's counsel, and by consent of the prosecuting attorney.    It is now contended by counsel for respondent that he urged upon the court that the jury be discharged, and the cause continued over the term, and we think the record bears out this statement.    Time was asked by respondent's counsel, but it does not appear he had any voice in fixing the date to which it was continued, or that the jury then impaneled was to return at that time

and hear the case. This was fixed by the court, and the court then stated to the jury:

"This case will be adjourned until the 4th day of April, and you will abstain from conversing with any one, or listening to any one conversing about the case."

It also appears that, at the adjournment had the night before, the court had also cautioned the jury, in which the court said:

"If any one attempts to converse with the jury, you will report to me about it. If any person comes around, and proposes to converse with them, or seeks a conversation with them about it, you will report the name of that person to me."

On the 4th of April, after the jury had returned into court, the counsel for respondent called the attention of the court to the journal entry of February 16, and asked that it be corrected, as the adjournment was not on his motion. The court refused to make the correction, and ordered that the entry be left to stand as made.

Section 9549, How. Stat., provides that the prosecuting attorney shall indorse on the information the names of the witnesses known to him at the time of filing the same,—

"And at such time before the trial of any case as the court may, by rule or otherwise, prescribe, he shall also indorse thereon the names of such other witnesses as shall then be known to him."

In the present case it appears that the name of the witness was known to the prosecuting attorney at the time of filing the information, but that her name was not indorsed, through inadvertence. Some discretion is left with the court, under this statute, in reference to the indorsement of names of witnesses on the information; and we think, under the circumstances here stated, the court very properly allowed the prosecuting attorney to make the indorsement. The witness had been produced

on the examination before the justice, and there gave testimony. She was the most important witness for the people in the case, and that fact must have been well known to respondent's counsel. In permitting the indorsement of this name on the information, however, the court was bound to take care of the rights of the respondent; and, if reasonable claim was made that he was not 'prepared to meet the testimony expected to be given by the witness whose name was so indorsed, the court should have given reasonable time to the respondent to prepare his defense, and we think the case should have been continued over the term, as requested by respondent's counsel. The court granted a continuance, but, without the consent of the counsel for respondent, put the trial down for April 4, and directed the same jury to return at that time, and hear the cause.

What might have been anticipated and expected from the excited state of feelings in that community, naturally growing out of the crime charged, seems to have followed. A father was charged with rape upon his own daughter, a girl then only about 14 years of age. It is a charge which in any community would stir up and arouse, not only comment, but a feeling of hostility to a person charged with so heinous a crime. Good men and good women would naturally feel that no punishment could be meted out, to such an unnatural father, adequate to the crime; and though the man may have been ever so well known in the community, and have borne ever so good a character for honesty and virtue, yet a charge made by his own daughter would tend strongly to impress people in any community with the truth of the charge. People would talk about it, and necessarily these things would come to the ears of the jury, separated and returning to their homes, and there remaining from February 16 to April 4,—a period of over six weeks.

Perhaps there is no crime known to the law that would arouse more feeling and comment in a community than the one here charged.

After the jury had returned to their seats in the jury-box, on April 4, 1888, counsel for respondent again asked the court that the cause be continued over the term, and the cause then tried before a jury to be impaneled. This the court refused. Counsel for respondent then asked that he have leave to challenge certain of the jurors. Judge Kelley, who then appeared in the case as counsel for the people, stated:

"I think that, owing to the unusual length of time since the adjournment in this case, the respondent should have the right to challenge any juror for cause."

The prosecuting attorney then said:

"The jury has been sworn, but we will waive that.

"*By the Court.* You can challenge for cause any juror."

Counsel for respondent was then permitted to examine Mr. McClatchey, one of the jurors; and from such examination it appears that he had heard some talk about the case on both sides; that he could not tell just what talk was had, he had heard so many stories; that he had heard people talking about the public sentiment about the case,—about the feeling in the community; that the people were talking about the state of public sentiment in the community, but that he took no part in these conversations, and did not think he had been influenced by them. Respondent's counsel then challenged the juror for cause. The court refused the challenge, and overruled the motion to discharge the juror from the panel.

Mr. Miller, one of the jurors, was then examined by the counsel for respondent, and asked:

"*Q.* Do you know George H. Lee, of Alcona township?
"*A.* Yes, sir.

"*Q.* Did you not state in George H. Lee's presence, since the last adjournment of this case, that you believed that Evans was guilty?

"*A.* No, sir."

Counsel for respondent then offered to show by Mr. Lee, who was present in court, that Mr. Miller, the juror, stated in his presence, since the adjournment of the case, that he believed Evans guilty.

"*By the Court.* I shall not permit it."

These rulings of the court were all excepted to by respondent's counsel, and error assigned thereon.

We think the court erred in not permitting the case to be continued over the term, when requested by counsel, and continuing it for six weeks, and recalling the same jury for its trial, under the circumstances. Having recalled the jury, and permitted respondent's counsel to challenge for cause, it was error not to excuse the juror McClatchey. The respondent had a right of trial by an impartial jury, and during the progress of the trial he had a right to have all matters that could in any way tend to influence or bias their judgment excluded from them. The juror himself confessed that people had been talking in his presence about the facts of the case, the state of public sentiment upon the case, and the feelings of the community in regard to it. It is evident that the sentiment of the community was against the respondent, and, human nature being no different in jurors than in others, it must be presumed that with this feeling in the community, constantly talked of and in presence of this juror, he may have, however unconsciously, imbibed some of this sentiment, which may have influenced and biased his judgment. It is no answer that the juror thought he had not been influenced. If on the trial of the cause evidence of public sentiment had been allowed to go to

the jury, nothing could save the verdict. *Churchill v. Circuit Judge*, 56 Mich. 540 (23 N. W. Rep. 211).

Counsel for respondent should have been allowed to call witnesses to establish the fact that the juror Miller had expressed the belief that the respondent was guilty of the offense with which he stood charged, or at least the court should have heard the evidence offered, and, if any doubt was entertained by the court after hearing the evidence, the court should have allowed the challenge for cause. The law intends that jurors shall go into the jury-box entirely unbiased, impartial, and indifferent. Therefore every exertion is made to exclude all who have formed a fixed opinion in respect to the matter in issue. For the purpose of discovering those so disqualified, a rigid and searching inquiry is allowed previous to the acceptance of the juror. This is usually done by the examination of the juror himself, under oath, on his *voir dire*, as the phrase is; but, in addition to this, witnesses can be called to testify to any fact tending to show the incompetency of the juror. Proff. Jury, § 166; 1 Bish. Crim. Proc. (3d ed.), § 934; 3 Whart. Crim. Law (7th ed.), § 3131; *People v. Mather*, 4 Wend. 233.

The original jurors sworn in the case on February 14 were retained as jurors in the cause, and the trial proceeded. The prosecuting attorney was permitted by the court, under objections of respondent's counsel, to again make an opening of his case to the jury.

Witnesses were then called and examined, from which it appears that the respondent, in September, 1885, was living in Harrisville with his family, consisting of himself; his wife, Esther Evans, the step-mother of Rose, to whom he had been married since November 1, 1881; his two boys, George and Charles, who were at the time aged 17 and 11 years, respectively; Rose, his daughter, then 14

years of age; a young child by his wife, Esther; and Esther Evans' mother, a Mrs. Huston.

Some time about the middle of September, 1885, Mr. Evans and his wife had some trouble about their family affairs, and Mrs. Evans and her mother, Mrs. Huston, left Harrisville, and went to Alpena to a sister of Mrs. Evans. Mrs. Evans remained away about four weeks, when she returned. Mrs. Huston remained away until February, 1886, when she also returned to live in the family again. It is claimed that during the time Mrs. Evans was away the crime was committed.

Rose testified substantially that during the time Mrs. Evans was away she slept upstairs in a back-room; that there were two rooms upstairs, a front and a back room,— two beds in the back-room, and one in the front room; that the boys slept down-stairs; that during the time Mrs. Evans was away she was alone upstairs some of the time, and some of the time Mrs. Bond and Gustie Moore stayed there; that one evening when she went to bed upstairs her father was not at home; that Charlie was down-stairs; that her father came upstairs, and when he came to her bed she awakened; that he got into bed, and there had intercourse with her; that she said, "Don't, father," and he told her to keep still; and that she made no further outcry; that she made no disturbance, because she was afraid.

Witness further testified that she first told Mrs. Huston of what her father had done; that this was the first night after Mrs. Huston returned to live with them. On cross-examination, this witness was asked:

" Q. You don't claim that he fully accomplished his purpose, do you?

" A. I know he tried pretty hard.

" Question by Counsel. You don't claim he penetrated you?"

No answer was made by the witness, when the court asked:

"You know what penetration ·means?
"*A.* I am not altogether a fool.
" *By the Court.* Then answer the question.
" *A.* Yes; he did."

Witness further testified that he left no marks upon her person, nor did he tear her clothing in any way. Witness was then asked by counsel for respondent:

"Rose, haven't you made other charges of this same nature against other men that were perfectly innocent?"

This was objected to by the prosecution as immaterial. The court permitted the question and answer, but re-marked to counsel:

'You may ask the question, but you will have to accept her statement."

The question being then repeated, the witness answered: "No; I didn't."

Witness further testified that this was the only circum-stance of the kind between her father and herself; that her father had whipped her sometimes severely. The people rested their case upon the testimony of Rose Evans.

The defendant · was produced as a witness in his own behalf, and testified that the story told by Rose was entirely and wholly untrue; that the first he ever heard of the accusation was in March, 1886; that the only time he ever punished Rose severely was when she disobeyed him, and went to the barn with other boys besides her brothers.

Mrs. Esther Evans was sworn as a witness in behalf of respondent, and from her testimony it appears that her mother had made trouble in the family, and sometime in March was about to go away; that Rose came in one

evening, when her mother told her the story told by Rose. Mrs. Evans then said:

"'Rose, you ought to be ashamed of yourself to tell such stories as that. You have told the same of your little brothers, and you have told fearful stories about me, and now you have commenced to tell stories about your father.' Rose got up, and I said: 'Rose, do you mean to say that story is true?' And she says: 'No, ma; it is not true; but I had to tell her something to shut her mouth.' Then mother got up, and she says: 'Do you deny that?' And Rose says: 'Yes, I do; you are always picking stories out of me.' Rose before this had said her brother George had tried to corner her up, down stairs, and insult her, and afterwards said it was not true."

This statement is corroborated by Charles Evans, then a boy 14 years old. He says:

"My grandmother, mother, and Rose were there; and while they were talking Rose got up, and slapped her chair against the wall, and said it was just a lie she told to please her grandmother."

These statements were not contradicted by Rose.

It was clearly shown on the trial, and not disputed, that Mrs. Evans and her mother went away on Friday night. On the following Monday morning Mrs. Bond came there to sew for the family, and remained there all the time, with the exception of two Saturday nights, until Mr. Evans left to bring his wife back. While she was there she always slept in the same room with Rose. Rose testified that this affair took place before Mrs. Bond came. Gustie Moore stayed there several nights, and slept in the same room with Rose. The two Evans boys testified that on every night while Mrs. Evans was gone, and Mrs. Bond or Gustie Moore was not there to sleep with Rose, the brother Charlie slept in the other bed, in the same room with her. This is not denied by Rose.

Upon Mr. Evans' return to the house, on the night Mrs. Huston told this story to Mrs. Evans, he noticed

something unusual in the appearance of his family, and asked what the trouble was, and was told by Mrs. Huston. In his anger, he drove both Mrs. Huston and Rose away from his house. Outside parties took the matter up, and a prosecution for incest was first instituted, which was finally dropped in the circuit court, and the prosecution for rape begun.

Mrs. Elizabeth Carle was called as a witness for the defense on the trial. She lived next door to Mr. Evans, and during the time Mrs. Evans was gone she was in the house almost every day. Witness was asked by counsel for respondent:

"Did you ever have any conversation with Rose about a charge she made at one time against George Evans having made a similar assault upon her?
"Yes, sir; she said—"

The further answer was objected to by the prosecution, and objection sustained by the court. Counsel for respondent then offered to show by the witness that Rose did make similar accusations against her brothers George and Charlie, and other people, in a great multitude of cases, and then admitted that they were not true; that she had a sort of mania for telling that men made assaults upon her of a like character. Counsel for respondent then offered to show by the witness that the girl Rose, in the spring of 1885, made a charge against a prominent citizen of that village, of having taken her into a compromising position with himself, and having exhibited his person to her, and compelled her to handle his private parts; that she afterwards admitted its falsity.

"*By the Court.* You have asked her this question, and she said, 'No,' and you now bring in another witness to show she lied, and the question is whether it is not distinctly collateral matter. I am inclined to take the position I did yesterday, when I permitted you to ask the question, and it will have to rest there."

Exception was taken to this ruling, and error assigned thereon. We think this evidence should have been admitted. The people rested their case upon the testimony of Rose Evans alone. No other witness was sworn by the people. She is flatly contradicted by the respondent, her father, and she does not dispute the testimony of her mother and her brother Charles in their statement that, though she told her grandmother the story, it was not true. The testimony of Mrs. Bond and Gustie Moore, taken in connection with that of her two brothers, as to the room being occupied by some person with her every night during her mother's absence, tends strongly to contradict her story. It is difficult to understand or comprehend how a girl who apparently has all her faculties can make such a charge against her father if it is false, unless, as claimed by counsel for respondent, there be some mental or moral peculiarity about the girl herself. The jury were asked to take her story, and in reliance thereon find the respondent guilty. It became a question of fact for their consideration; and they ought to have been made acquainted, under the circumstances stated and proven, with the mental and moral qualities of the girl. If she was accustomed, and had on numerous occasions, as claimed by counsel for respondent, made statements charging, not only her brothers, but numerous other men of that community, with other similar offenses, and then admitted the falsity of such charges, it would have a tendency to show a morbid condition of mind or body, and go a long way in explaining this charge, which, under the circumstances, and the surroundings shown to exist, seems almost unaccountable. It is claimed that the testimony offered would tend to show that she was the subject of hallucinations upon this subject, and is in its nature independent evidence, and in no sense collateral.

We think this view is sustained in the case of *Derwin v. Parsons*, 52 Mich. 426 (18 N. W. Rep. 200). Mr. Justice COOLEY, in his opinion in that case, says:

"The case was one which justified a good degree of liberality in the admission of evidence. The parties were directly opposed in their testimony, and the jury would be likely to accept the statement of the one who was best supported by the circumstances. * * * To questions whether the plaintiff had not made charges similar in nature against two other persons, objection was made, but we have no doubt it was proper to allow them, and also to prove the facts, if she denied having made the charges."

Complaint is also made of the argument of Judge Kelley to the jury in the close of the case. Judge Kelley said:

"Joseph Evans had the right in this case that the law of this Commonwealth gives to him, and says to us: 'You cannot deprive him of it, when he avails himself of it.' It says to him: 'You may bring into this court, before this jury, one or two or three or a score of the best people of this county, to testify to your good character as a citizen, and good moral character as a man, and conduct and deportment.' Joseph Evans, if you had done this in this case, by ten good people, I think that the jury might have acquitted you of that charge. It is the great and potent evidence in a case of this kind, where the evidence is of one against the other; and I say to you, gentlemen of the jury, the want of it is a circumstance that you cannot overlook as honest men and good citizens and jurors. That door was closed to us. We could not put a living soul upon the stand to prove the contrary to his good character until he put his witnesses on. It would have been of the utmost importance in this case, when his statement is pitted against this poor girl, and stands there face to face with her statement, that ten good respectable men, or six, or any number, of good citizens, should come in and say: 'I have known him for ten or fifteen or twenty years as a man of good character;' and we have the right to say to you, what do you think of that when this door is opened, and he does not avail himself of it?"

Much other language of like character was indulged in by the counsel for the prosecution in his closing remarks to the jury. These remarks were permitted by the court, under objection of counsel for respondent. This certainly was error of the gravest character. No presumption of guilt arises from the fact that a person, when on trial for a crime, fails to call witnesses in support of his good character. This is a privilege which the accused may avail himself of if he chooses. If a person on trial for an alleged offense offers no evidence of his good character, no legal inference can arise from such omission that he is guilty of the offense charged, or that his character is bad. Whart. Crim. Ev. (8th ed.) § 62. The court should not have permitted such an argument to the jury. The jury, while deliberating on their verdict, have no right to take into consideration the fact that respondent failed to call witnesses in support of his good character, and weigh it against him as testimony in any manner to establish guilt. 1 Bish. Crim. Proc. (3d ed.) § 1119.

The error was not cured by the court afterwards instructing the jury that they should not consider such argument. Counsel for respondent calls our attention to a recent case in Illinois fully sustaining this doctrine. The statute of Illinois provides that—

"A defendant in any criminal case or proceeding shall only, at his own request, be deemed a competent witness; and his neglect to testify shall not create any presumption against him, nor shall the court permit any reference or comment to be made to or upon such neglect."

In *Quinn v. People,* 123 Ill. 333 (15 N. E. Rep. 46), counsel had assumed to comment on defendant's failure to testify in his own behalf; and the supreme court of Illinois, considering that case, say:

"How much did it avail for the court to tell the jury that the remarks of counsel were improper? His words had found a lodgment in the minds of the jury, spent

their force, and subserved the purpose for which they were uttered, and it were idle to talk about removing their effect upon the jury by a mere declaration from the court that they were improper. As well might one attempt to brush off with the hand a stain of ink from a piece of white linen. One, in the very nature of things, is just as impossible as the other."

It cannot matter whether these safeguards are thrown around the accused by statute or by the common law, to the end that he have a fair and impartial trial. It was gross error for the prosecution to indulge in such remarks, and the error was not cured by the charge of the court. It is undoubtedly true that these words were more potent, and more effective and lasting, falling from the lips of one who was at the very time of their utterance occupying the honorable and high position of a circuit judge in an adjoining circuit.

This Court has upon numerous occasions been called upon to express its opinion upon the conduct of prosecuting officers in the prosecution of criminal cases, and has as often laid down the rule that it was their duty, as well as the duty of the court, to see that the accused had a fair and impartial trial. They are not the attorneys of the complaining party, but represent the people, who are as much interested to protect the innocent as in the conviction of the guilty.

We are not called upon in this case to express any opinion as to the right of a circuit judge of an adjoining circuit to lend his aid in the prosecution of a criminal case,—to lay off, for the time, his judicial ermine, and take part as counsel; but it seems to us that as well might the judge of the circuit call an adjoining circuit judge to preside, and he take part as a prosecuting officer, and from the bar give his opinion of the guilt or innocence of the accused. An opinion so given would in

most cases be as potent in its influence upon the jury as though given from the bench.

Section 7247, How. Stat., provides:

" No judge can practice or act as a counsellor, solicitor, or attorney in the court of which he is a judge, except in those suits in which he shall be a party, or in the subject-matter of which he shall be interested."

Under this statute, it was held by this Court in *Bashford v. People*, 24 Mich. 244, that, though the circuit judge had resigned, his resignation to take effect five days thereafter, and had called another judge to preside, he was disqualified to appear as counsel in the case; Mr. Justice COOLEY remarking in that case:

" We have no doubt that whatever connected with a trial is forbidden on grounds of public policy the party concerned may except to; and that he has the same right to insist upon his exception when it has reference to the breach of a rule prescribed for the direction of the highest officer of justice as of one for the lowest. The correctness of motive, the high standing and upright character of the officer concerned, cannot be considered on such an exception, and consequently cannot be an answer to it."

In *People v. Cline*, 44 Mich. 290 (6 N. W. Rep. 671), it was held that the prosecuting attorney was disqualified from prosecuting a criminal proceeding where the complaining witness was his brother, and the firm to which he belonged was to be affected by the transaction.

It is contended, further, by counsel for the respondent, that the charge of the court was utterly unfair to defendant, and misleading to the jury, in entirely failing to call their attention to the evidence showing that no assault whatever had been committed upon the girl; that the court should have called the attention of the jury to the evidence of the defendant that he had not assaulted her at all; the evidence of the two Evans boys that upon

every night while Mrs. Evans was gone, and Mrs. Bond was not there, Charles slept in the bed in the same room with her, because Rose was afraid to go upstairs alone, which Rose did not deny; that, when her charge against her father was first made known by Mrs. Huston to Mrs. Evans, she denied the truth of the story, as sworn to by Mrs. Evans and Charles, and that this she did not deny.

Instead of the court calling the attention of the jury to these facts, the charge went upon the theory that the defendant claimed the girl had not resisted to the extent necessary to make connection, under the circumstances, rape; and that this was evidenced by the girl's failure to make an outcry or resistance at the time, or complaint afterwards. The record shows that evidence of this character was drawn out of the girl upon her cross-examination; but the whole theory of the defense was that the story of the girl was fabricated, as such stories had been fabricated by her in reference to other parties, and upon this theory the case should have been submitted to the jury by the court. Putting the defense to the jury in this case, that the father made claim that his daughter should have resisted to the utmost of her strength in order to make the offense rape, when the whole theory of the defense was that the girl had fabricated the story, was not only misleading to the jury, but such theory would of necessity prejudice the mind of any fair-minded man upon the jury.

A more serious question, however, remains to be discussed. As we have stated, upon the arraignment of the respondent upon the information then filed, his counsel interposed a plea in abatement; stating as the grounds of such plea that the justice before whom the examination was held had not stated in his return that any offense not triable by a justice of the peace had been committed,

nor had said justice in said return stated that there was probable cause to believe the respondent guilty of the crime charged, or of any offense or crime, but that, on the contrary, said justice expressly declared that he did not believe that said offense had been committed, or that respondent was guilty thereof, and that he only required respondent to recognize to appear for trial in the circuit in deference to and by reason of the intense public feeling upon the subject against respondent. This plea was verified on December 7, 1886. On the same day the justice, by order of the circuit court, made a further and amended. return to the examination had before him, in which he states that upon such examination—

"It appeared to me that an offense not cognizable by a justice of the peace had been committed, and that there is probable cause to believe the prisoner guilty thereof."

Upon the filing of this amended return the court overruled the plea in abatement, and the cause proceeded to trial upon the information, which was filed before such further return was made by the justice. The certificate and return first made by the justice is not set out in the record, but it is sufficiently shown by the plea filed, and the further return made, that the first return to the examination, and the one upon which the information was filed, did not contain any finding that it was made to appear on the examination that a crime had been committed, and that there was probable cause to believe respondent guilty. These were necessary prerequisites to the filing of the information. The examination of persons charged with offenses not cognizable by a justice of the peace was designed to take the place of a presentment by the grand jury; and it is only where it shall appear from such examination that an offense not cognizable by a justice of the peace has been committed,

and that there is probable cause to believe the prisoner guilty thereof, that he can be held for trial. How. Stat. §§ 9470, 9471.

The statute requires the justice, after "an examination of the whole matter," to come to an opinion as to whether or not an offense has been committed; and, if of opinion that there has been, then as to whether there is probable cause to believe the accused guilty thereof, and thereupon to discharge or hold him to answer according to the conclusion reached; and it is only when the conclusion reached by the justice, after an examination of the whole matter, is that an offense has been committed, and that there is probable cause to believe the accused guilty thereof, and so certified to the circuit court, that an information may be filed. This conclusion or opinion of the justice is a judicial determination, and the basis of the right to proceed in the circuit court by filing information. *Annis v. People*, 13 Mich. 511; *Turner v. People*, 33 Id. 363; *Yaner v. People*, 34 Id. 286.

In the present case, it appears that at the time the information was filed in the circuit court, upon which the respondent was put upon his trial, no determination had been made by the justice, either that any offense had been committed, or that there was probable cause to believe the respondent guilty, and the prosecuting attorney had no authority to proceed in the circuit court by filing such information. The fact that the court compelled further return does not aid the right to proceed. The information was filed upon the return of the justice, as it then appeared. We are not called upon to determine whether a new information might have been filed after the justice's further return was filed in the circuit court. The court refused to quash the information then filed, and the case proceeded to trial thereunder. The circuit court having no jurisdiction at the time of filing the

information, it follows that a conviction thereunder cannot be sustained.

For the errors pointed out the conviction must be set aside, and respondent discharged.

The other Justices concurred.