Olan WEST *v.* STATE of Arkansas

CR 86-147                                             719 S.W.2d 684

Supreme Court of Arkansas
Opinion delivered November 17, 1986
[Supplemental Opinion on Denial of Rehearing
January 26, 1987.*]

*Dudley and Hays, JJ., would grant rehearing.

*Beth Gladden Coulson*, and *L. Gene Worsham*, for appellant.

*Steve Clark*, Att'y Gen., by: *Joel O. Huggins*, Asst. Att'y Gen., for appellee.

GEORGE ROSE SMITH, Justice. The appellant, Olan West, was convicted of sexual abuse in the first degree and was sentenced to a six-year term of imprisonment and a $5,000 fine. The Court of Appeals transferred the case to us as presenting an issue of statutory construction and a question of significant public interest. Rule 29(1)(c) and (4)(b). For reversal the appellant argues that the testimony of Kenny Ashcraft should have been excluded, that proof of earlier similar accusations by the prosecutrix should have been permitted, and that the State failed to prove "forcible compulsion." We reverse the judgment on the second of the three grounds.

The prosecutrix, 15 years old at the time of the offense, knew the defendant West slightly, having twice attended the church at which he was the minister. She testified that on December 15, 1984, between one and two in the afternoon, as she was leaving a local store West asked her if she wanted a ride to her home (about two miles out the highway). She said she wanted to walk. He said he would be down that way in a little while and would ask her again. She testified that after she had walked a while she looked back and saw his truck just sitting by the road on top of a hill. As she kept walking he caught up with her and offered her a ride. She accepted because she was tired, but he told her not to get in until some cars had gone by. Instead of taking her home he turned off and drove on a dirt road that went up Hyster Mountain. As they were going up she saw a white car with a black top. He told her to duck her head, because "someone might think something." He pressed her head down and kept driving until he moved his hand and said, "Okay, you can lift up now."

When they stopped, he told her there was a trail that went to a cliff from which she could see her house. They got out, and he followed her until she stopped two feet from the cliff. He came up behind her, put his arms around her, put his hand over her left breast, and kissed the back of her neck. She said he cupped her

breast firmly and squeezed it. With some difficulty she removed his arms and ran back to the truck, not knowing where else to go. When they started back, he told her not to tell any of her friends she had been with him. He took her home and let her out at the end of the driveway.

The prosecutrix's mother testified that she heard a car door slam, went outside, and met her daughter about halfway down the driveway. The mother said she knew something was terribly wrong, because the girl was shaking and crying. Under the excited utterances exception to the hearsay rule, A.R.E. Rule 803(2), the mother testified in detail about the girl's account of what had happened, which was substantially the same as the girl later testified.

Another witness for the State was Kenny Ashcraft, who had known West for 34 years, "all my life." He said that on the afternoon of December 8, 1984, he met West in his truck on Hyster Mountain. Ashcraft was in a white car. He said West had his arms flung back against the seat, and "something went down in the seat." He wasn't sure what it was, but he did see blond hair.

West testified that he had never picked up the prosecutrix, had never taken her anywhere, and had never touched her breasts. He said that at about 9:00 a.m. on Saturday, December 8, he and his wife had left their home in Perry County and had driven to Ashley County, where their son lived. The Wests got there about 3:00 p.m. On the next day, Sunday, West took his wife to Louisiana and returned to his son's house. The deer season opened on Monday; West testified that he and his son hunted all week. He joined his wife in Louisiana on December 14, and they drove back to Perry County on December 15, getting home at about 5:00 p.m. West's testimony was corroborated as to various times and places by his son, two grandsons, his mother-in-law, and a brother-in-law. West had been a minister in Perry County for 28 years and presented the testimony of several character witnesses. As the appellant's brief puts it, the case was reduced to a swearing match. The jury accepted the testimony of the State's witnesses.

We first discuss the point presenting reversible error; that is, the court's refusal to allow the defense to cross-examine the prosecutrix about her similar accusations against two other men.

The issue arose just before the trial began, when the State made a motion in limine for the court to exclude the evidence about former accusations. The court held that the evidence was not admissible and granted the motion in limine. Defense counsel, in later making a proffer of the proposed testimony, said that it was anticipated that the prosecutrix would deny that she had ever made any such statements to anyone. Counsel then made this proffer:

> . . . [T]hree witnesses would testify that the prosecuting witness . . . had made statements to them on two different occasions. . . . At one time at a concert [she] stated that someone had attempted to touch her breast, and upon learning this they went to the area, and there was no one there. On another occasion, she had stated to them that her uncle had attempted to fondle her, and again, this had been denied by the uncle.

The courts are not in agreement about the admissibility, in cases of rape or other sexual offenses, of proof that the prosecutrix had made similar accusations that she later admitted to be false or that are proved to be false. The cases, comparatively few in number, are collected in an annotation to *People* v. *Hurlburt*, 166 Cal. App. 2d 334, 333 P.2d 82, 75 A.L.R.2d 500 (1959). In the *Hurlburt* case the defendant was charged with lewd conduct toward a 9-year-old girl. The defense offered to prove that the child had made an identical charge against a man her mother had been running around with, and that she had made the same statement at a prior time about another person and later said it was a lie. The appellate court held that the proof should have been admitted, relying primarily on the decision in *People* v. *Evans*, 72 Mich. 367, 40 N.W. 473 (1888). In the Michigan case the defendant was charged with the rape of his 14-year-old daughter. The defendant offered proof that she had made similar accusations against a number of men, including family members. The Michigan court summed up its position in this language:

> If she was accustomed, and had on numerous occasions, as claimed by counsel for respondent, made statements charging, not only her brothers, but numerous other men of that community, with other similar offenses, and then admitted the falsity of such charges, it would have a

tendency to show a morbid condition of mind or body, and go a long way in explaining this charge, which, under the circumstances, and the surroundings shown to exist, seems almost unaccountable.

The principal cases that have admitted the evidence are from the two states just cited, California and Michigan.

The only Arkansas decision on the point is *Peters* v. *State*, 103 Ark. 119, 146 S.W. 491 (1912). That was a prosecution for the rape of a 12-year-old girl. On cross-examination she was asked if she had not told a certain person that she had had intercourse with old man Sanders, if she had not told another person that she had had intercourse with the defendant, and if she had not told still a third person that she had had intercourse with men a great number of times. The prosecutrix answered all three questions in the negative. The trial judge refused to allow the defense to call witnesses to testify that she had made the alleged statements. We upheld his ruling, giving two reasons. One, the defense did not offer to prove that the statements, if made, were false. Two, although it was argued that the statements would go to show that the prosecutrix had a mania for making such false charges, there was no proof that she was mentally deranged, of weak mind, or subject to hallucinations.

Wigmore severely criticized the second ground for the exclusion, saying that "such a dangerous ruling deserves protest." Wigmore on Evidence, § 963 (rev. ed. 1970). He recommended that the court peruse § 924a of his treatise. There he quoted several articles by psychiatrists and other specialists to show that some women and young girls have such fantasies about being attacked by men that they are induced to make false accusations from time to time.

█ We agree with Wigmore's basic criticism of our holding in *Peters*, that we went too far in deciding that the defense must show not merely that the prosecutrix had a mania for making such charges but also that she was actually insane. In that respect we disapprove the holding in the *Peters* case. Treating the point as one of first impression, we agree with the position taken by the California and Michigan courts. Here the defense proposed to show that this is the third time the prosecutrix had made such charges and that the first two were false. If the prosecutrix does

deny on cross-examination that she made the statements or admits making them but asserts them to have been true, then the defense should be permitted to prove that the statements were made, if that is not admitted, and that they were false. That proof would be admissible not merely as affecting the prosecutrix's credibility but also as raising a possible doubt about the truth of the present charge.

The argument that Ashcraft's testimony should have been excluded is presented on the theory that since the information alleged, and the prosecutrix testified, that the incident on Hyster Mountain took place on December 15, whatever Ashcraft may have seen on the mountain on December 8 is immaterial. That argument is without substance. Under our statute the exact date of the offense is not material. Ark. Stat. Ann. § 43-1015 (Repl. 1977). The material issue is, what, if anything, happened to the prosecutrix on Hyster Mountain on one date or the other. It was the jury's prerogative to accept the version given by the State rather than the testimony presented by the defense. The court was correct in permitting the jury to hear the testimony of both witnesses, the conflict as to the date going only to the weight of the evidence.

The appellant's third argument is that the State failed to prove that, in the language of the statute, West engaged in sexual contact with the prosecutrix "by forcible compulsion." Ark. Stat. Ann. § 41-1808 (Repl. 1977). The court gave AMCI 1808, including the definitions of sexual contact and forcible compulsion. Sexual contact means, among other things, an act of sexual gratification involving the touching of the breast of a female. That definition by itself does not require force. Forcible compulsion is defined as either physical force or a specified threat. Here there was no threat. Hence the State was required to prove that the defendant engaged in an act of sexual contact by the use of physical force. The argument is that no physical force has been shown.

Upon the testimony in this case, whether physical force was used was a question for the jury. The term "physical force" is not defined in Chapter 18 of the Criminal Code, which is devoted to sexual offenses, but the same definition of physical force is contained in four other chapters of the Code, that definition

being: "Physical force" means any bodily impact, restraint, or confinement, or the threat thereof. Ark. Stat. Ann. § 41-501(3) in the chapter on justification, § 41-2101 in the chapter on robbery, § 41-2801(8) in the chapter on obstructing governmental operations, and § 41-3001(4) in the chapter on prostitution. Here, according to the prosecutrix's version of the incident, the defendant accomplished his purpose by restraining her until she was able to free herself. From her testimony "[H]e put his arms around me, and compressed, and put his right hand over my left breast firmly, and I had to break away from his arms." Later she said: "I had to remove his arms, you know, hard, and then I just took off back to the truck." She also said she had no forewarning of his approach; he came up from behind her. The appellant certainly used all the physical force that was necessary to accomplish his purpose. In the circumstances of this case the proof was sufficient to support the jury's verdict of guilty.

Reversed and remanded.

Holt, C.J., and Purtle and Newbern, JJ., concur.

David Newbern, Justice, concurring. Olan West has been convicted of first degree sexual abuse and sentenced to imprisonment for six years and a $5,000 fine for putting his arms around the fifteen-year-old prosecutrix and touching her breast. I do not find this conduct to be that defined in the statute describing the crime. In my opinion there was not the sort of "forcible compulsion" the Arkansas General Assembly condemned in Ark. Stat. Ann. § 41-1808(1)(a) (Repl. 1977) by providing: "A person commits sexual abuse in the first degree if . . . he engages in sexual contact with another person by forcible compulsion. . . ."

The crucial direct examination testimony of the prosecutrix was as follows:

> Q: And he got in front of me at first, and he said, "This is the trail." And then I walked, and I walked on ahead in front of him a little ways. I went to the cliff, and I went two feet in front of the cliff, and he came from behind me, without me knowing, put his arms around me, and compressed, and put his right hand over my left breast firmly, and I had to break away from his arms, and I just took back to the truck. I ran back to the truck.

. . . .

Q: And you stopped in front of the cliff?

A: Yes, ma'am.

Q: And then tell me again what happened.

A: He came up behind me without me knowing, put his arms around me, put his right hand over my left breast, kissed me on the neck.

Q: When he put his hand over your breast, how did he hold your breast?

A: He cupped me firmly.

Q: Okay, so he squeezed your breast, is that what you are saying?

A: Yes, ma'am.

Q: And he kissed your neck?

A: Yes, ma'am.

Q: Okay.

A: And then I broke. I had to remove his arms, you know, hard, and then I just took off back to the truck.

A: So, you had to remove his arms hard, you said, break away?

A: Yes.

Q: Okay, did you have any forewarning that he was going to come up behind you like that? Did he say anything?

A: No, ma'am.

Q: So, he didn't say anything to let you know that he was going to approach you?

A: No, ma'am.

Q: And when you ran back to the truck, then what happened?

A: I just got in. I didn't know where else to go, because I didn't know that place. I got in, and then he came around

and got in. I told him I had to go home. That my mom was going to be worried about me. He turned the truck around, and then while we were driving down the road, that same dirt road, he told me not to tell any of my friends, because they might get jealous.

Q: Not tell any of your friends about what?

A: About me being with him.

Q: Okay. Okay. What happened then?

A: He drove on down the road, and then he drove me to the end of my driveway. He pulled up at the end of my driveway, and then he goes, "I'm just going to drive you to the end of the driveway." And so, before I was starting to get out and I looked over at him, and I saw him coming toward me. He put his hand on the seat and leaned over. I turned my face real quick, and he kissed me on the cheek. And then I got out of the truck and just started walking up fast towards our house.

"Forcible compulsion" is defined in Ark. Stat. Ann. § 41-1801(2) (Repl. 1977) as "physical force, or a threat, express or implied, of death or physical injury to or kidnapping of any person." The commentary to the statute includes the following:

> The term "forcible compulsion" was used by the legislature in 1967 in redefining the offense of first degree rape. See, Act. 362 of 1967, § 1 previously indexed as Ark. Stat. Ann. § 41-3401 (Supp. 1973). Although the term was not statutorily defined, the legislature presumably intended to effect no change in the degree of force necessary to constitute the offense of rape. This chapter also employs the term "forcible compulsion" to define rape and other aggravated sex offenses. In essaying a definition of the term, the Commission likewise intended no change in traditional doctrine. Although, as indicated above, the definition is derived from the New York Penal Code, it was found to comport well with Arkansas decisional law. See, *Spencer v. State*, 255 Ark. 258, 499 S.W.2d 856 (1973) ("It may be violence or it may be putting the woman in fear, physically or mentally"). . . .

Most of the cases dealing with this definition have to do with the evidence necessary to show a sufficient threat of physical harm to rebut an allegation or implication of consent to the sexual conduct alleged. The case of *Spencer* v. *State*, cited above in the quoted statutory commentary, was such a case. There Chief Justice Harris dealt with the contention of an appellant that there was no forcible compulsion despite testimony that he had abducted the prosecutrix at knife point but had displayed no weapon a short time later when sexual intercourse occurred. The opinion reviewed a number of cases including *Bradley* v. *State*, 32 Ark. 704 (1878), in which we made it clear that the quantum of force is irrelevant as long as "the act be consummated against the will of the female." The relevant instruction approved in *Spencer v. State, supra*, was:

> Now with regard to force used, it may be violence or it may be putting the woman in fear, physically or mentally. In other words, the test is—was it against the will of the party upon whom the act was committed. [255 Ark. at 263, 499 S.W.2d at 859.]

Most other courts which have considered the definition of forcible compulsion have done so in the context of rape cases. While not directly on point factually, they are illustrative of what is meant by the term "forcible compulsion."

The drafters of the Model Penal Code discussed the concept of compulsion by force or threat and pointed out that sometimes, in order to make it perfectly clear that a token initial resistance is not enough, existing law specified that a woman must resist to the utmost. The drafters felt that the text requirement that the victim be compelled to submit adequately retained the concept that a token initial resistance is not enough while avoiding the ambiguity of the "utmost" phrase. Model Penal Code § 270.4, Comments at 246 (Tentative Draft No. 4, 1955.)

Several states which have statutes similar to ours use the term "forcible compulsion" to define nonconsensual sexual conduct as a criminal act. Alabama, Ala. Code § 13A-6-61; Hawaii, Hawaii Rev. Stat. § 707-730; Kentucky, Ky. Rev. Stat. § 510.040; Missouri, Mo. Rev. Stat. § 566.030.1; Oregon, Or. Rev. Stat. § 163.375; Pennsylvania, Pa. C. S. 18 § 3121; and Washington, Wash. Rev. Code §§ 9A.44.040, 050, Alabama, Hawaii, and

Kentucky retained the idea that more than a token initial resistance is required by describing the crime as requiring forcible compulsion sufficient to overcome earnest resistance in its definition.

Pennsylvania has recently had occasion to interpret "forcible compulsion." In *Commonwealth* v. *Mlinarich*, 498 A.2d 395 (Pa. Super. 1985) the court addressed the issue of the legislature's intention when it defined rape as sexual intercourse with another person "by forcible compulsion" and the interpretation to be placed on the phrase "forcible compulsion." After a long discussion of the common law and its inadequacy in defining rape because of its emphasis on lack of consent and the requirement that the victim resist to the "utmost" and the efforts of the American Law Institute and the Model Penal Code to find a more satisfactory definition the intermediate appellate court turned to the state supreme court's interpretation of forcible compulsion. Quoting *Commonwealth* v. *Perrin*, 484 Pa. 288, 398 A.2d 1007 (1979), it was held that rape, as defined by the Pennsylvania legislature requires actual physical compulsion or violence or a threat of physical compulsion or violence sufficient to prevent resistance by a person of reasonable resolution.

Again in *Commonwealth* v. *Rhodes*, 510 A.2d 1217 (Pa. 1986) the issue was the definition of "forcible compulsion." The Pennsylvania Superior Court had reversed a conviction for forcible rape of an eight-year-old third grader saying that there was insufficient evidence of forcible compulsion or threats. The supreme court reversed. Quoting *Wharton's Criminal Law*, Torcia, C. (14th Ed.) § 288, the supreme court said that "force" required in the definition of rape was not the force inherent in the act of penetration, but rather the force actually used or threatened to overcome or prevent resistance by the victim. From its review of the law and historical development of the term, the Pennsylvania Supreme Court held that forcible compulsion includes not only physical force or violence but also moral, psychological or intellectual force used to compel a person to engage in sexual intercourse against that person's will.

In *Commonwealth* v. *Stambaugh*, 512 A.2d 1216 (Pa. Super. 1986), Stambaugh was convicted of raping his stepdaughter. He appealed, arguing insufficient evidence of "forcible

compulsion." The appellate court held that the "force . . . need only be such as to establish lack of consent and to induce the woman to submit without additional resistance" and affirmed the conviction.

In *Salsman* v. *Commonwealth*, 565 S.W.2d 638 (Ky. App. 1978), Salsman was convicted of sexual abuse in the first degree and appealed on the failure to prove "forcible compulsion." In discussing the definition of forcible compulsion the Kentucky Court reviewed the commentary accompanying the penal code section. The commentary stated in part that:

> . . . the term includes a threat, express or implied, that overcomes earnest resistance by placing a person in fear. . . [T]he threat must be communicated, and it must be the cause of the submission. . . [T]he phrase "earnest resistance" requires more than token initial resistance but less than showing that the victim was physically incapable of additional struggle.

There surely was no "violence" in the instance before us now. Nor was there any "compulsion" in the sense of requiring the prosecutrix to perform some sexual act against her will. From the very moment she expressed her disapproval of the appellant's conduct by breaking away from his grasp there is no evidence that the appellant in any way coerced the prosecutrix.

No matter now disgusting we may find the act of this amorous preacher and grandfather of the prosecutrix's best friend, I cannot say the evidence was sufficient to show the "forcible compulsion" necessary to a conviction of first degree sexual abuse.

There is no showing that the appellant used any force whatever after the prosecutrix's first display of resistance. I cannot imagine we would be considering this case had the appellant been someone more nearly the age of the prosecutrix. This appellant must be treated equally under the law.

I agree the conviction must be reversed, but I would include as a basis for reversal the state's failure to prove "forcible compulsion."

Holt, C.J., and Purtle, J., join in this opinion.

Supplemental Opinion on Denial of Rehearing
January 26, 1987

722 S.W.2d 284

PER CURIAM.　█　We deny the State's petition for rehearing, but for purposes of clarification, we briefly address the Rape-Shield-law argument raised by the State but not specifically mentioned in the majority opinion. That law excludes evidence of any kind about the victim's prior "sexual conduct" and defines "sexual conduct" as deviate sexual activity, sexual contact or sexual intercourse. *See* Ark. Stat. Ann. §§ 41-1810.1 and 41-1810.3. As conceded in the State's petition, the victim's purported conduct, as proffered by appellant here, simply is not sexual conduct as that term is defined by law. Thus, appellant's proffered, relevant testimony clearly was not excludable under the Rape-Shield law, and the trial court, in ruling otherwise, committed error.

DUDLEY and HAYS, JJ., dissent.

STEELE HAYS, Justice, dissenting. We were mistaken to decide this case initially without regard to the rape-shield statute. The case was certified to us by the Court of Appeals on that issue and the point was argued by the parties. I believe the rape-shield statute does apply and that the trial judge was right in ruling that defense counsel could not cross-examine the prosecuting witness about the alleged prior accusations. I offer three reasons in support of that conclusion:

I. *The Rape-Shield Statute by its Terms is Applicable.*

The rape-shield statute begins by specifically defining its applicability:

> In any criminal prosecution under Arkansas Statutes Annotated 41-1803 through 41-1810, . . . opinion evidence, reputation evidence, or evidence of specific in-

stances of the victim's prior sexual conduct with the defendant or any other person is not admissible by the defendant, either through direct examination of any defense witness or through cross-examination of the victim or other prosecution witness, to attack the credibility of the victim, to prove consent or any other defense, or for any other purpose. Ark. Stat. Ann. § 41-1810.1 (Repl. 1977).

It will be noted that the statute applies *to any criminal prosecution* under Sections 41-1803 through 41-1810. The charge in this case was filed under Section 41-1808.

The section excludes evidence of any kind, for any purpose, about the victim's prior "sexual conduct." Section 3 of the rape-shield statute defines "sexual conduct":

As used in this Act, unless the context plainly requires otherwise, "sexual conduct" means deviate sexual activity, sexual contact, or sexual intercourse, as those terms are defined by Section 41-1801. [§ 41-1810.3.]

The present case involves "sexual contact." That term is defined in the section referred to:

As used in this Chapter, unless the context plainly requires otherwise: . . .

(8) "Sexual contact" means any act of sexual gratification involving the touching of the sex organs or anus of a person, or the breast of a female. [§ 41-1801.]

Sexual conduct includes sexual contact, which in turn includes touching the breast of a female. That is the charge in this case. Inasmuch as the pertinent definitions are word-for-word the same in both the Criminal Code and the rape-shield statute, it would be difficult to say that "sexual conduct" means one thing as used in the charging statute but another thing in the rape-shield statute.

II. *This Case is Within the Policy of the Rape-Shield Statute.* We compared the earlier practice in rape cases with the practice under the rape-shield statute in *Duncan* v. *State*, 263 Ark. 242, 565 S.W.2d 1 (1978):

The courts have historically permitted a defendant's attorney to cross-examine in detail a victim as to her complete sexual history. This information is usually totally irrelevant to the charge of rape. Act 197 was obviously

designed to limit this type of examination and protect the victim from unnecessary humiliation.

In a later case, *Marion* v. *State*, 267 Ark. 345, 590 S.W.2d 288 (1979), we explained the policy in greater detail, pointing out that it may exclude testimony having some probative value:

> After giving due deference to the right of the accused to present his defense, the statute seeks to protect the victim from unnecessary humiliation at trial based on irrelevant and prejudicial, though probative, evidence. [Citations omitted.] The appellant certainly has no constitutional right to present irrelevant evidence at trial. Here, for example, the fact that the victim has two illegitimate children and an alleged reputation as a prostitute is not relevant to the central fact in issue; i.e., whether the alleged act of sexual intercourse actually occurred. . . .
>
> . . . Here the statute is a valid exercise of the legislature's authority to shield the victim of a sexual offense from becoming, herself, the defendant.

The present case falls within the policy of the rape-shield statute. Whether someone attempted to touch the prosecutrix's breast at a concert has no substantial relevance to the main issue, i.e. did the defendant take the girl up Hyster Mountain and there forcibly squeeze her breast? Certainly the primary aim of the attempted cross-examination was to show that the prosecutrix is a liar, just as the law preceding the rape-shield statute permitted a defendant to show by cross-examination and by third persons that the prosecutrix had had sexual intercourse with other men, so that she might be found to have lied in saying that the accused used force to overcome her resistance when she claimed to have been raped. The rape-shield law is intended to prevent the victim "from becoming, herself, the defendant."

III. *The Appellant's Remedy Was Under the Rape-Shield Statute.* Section 1 of the rape-shield law, quoted earlier, excludes evidence of any kind, for any purpose, about the victim's prior sexual conduct. But Section 2 of the Act, § 41-1810.2, provides that notwithstanding that prohibition, if the defendant has relevant evidence of the victim's prior sexual conduct, a written motion "shall be filed" stating the purpose for which the evidence is believed to be relevant. An in-chambers hearing is then held. If the court finds that the offered proof is relevant to a fact in issue

and that its probative value outweighs its prejudicial nature, the court may make a written order stating what evidence may be introduced by the defendant.

No such motion was made in this case, though it might have been made even after the court sustained the State's motion in limine to prohibit the expected cross-examination of the victim. The defense, however, elected not to proceed under the statute. Instead, counsel insisted upon the right to cross-examine the victim in a way that would have put her in a "no-win" situation. She would be asked if she had not made similar accusations about other men. If she said yes and then admitted that they were false, the defense would have shown her to be a liar. If she denied having made such accusations, or admitted them but said they were true, the defense would be in a position to call witnesses to show that the accusations had been made and were false. As the trial judge said to defense counsel in sustaining the motion in limine: "You're getting into totally separate trials on other sexual conduct is what you're doing by going into this."

The unfairness inherent in defense counsel's argument could have been easily avoided had they filed the motion permitted by the rape-shield statute. It must be remembered that the defense did not have an absolute right to prove the incident at the concert even if the prosecutrix stood her ground. What we held in *Peters v. State*, 103 Ark. 1191, 146 S.W. 491 (1912), and adhered to in our opinion in this case, is that the defense may show that the prosecutrix has a pronounced tendency for making such accusations. That is the effect of even the cases favorable to the appellant, the California and Michigan cases that we cited. I am aware of no case holding that a single incident of a false accusation is admissible. The in-chambers hearing would allow the issue to be fully explored, instead of letting the defense put the prosecutrix in a helpless position even though the defense might not in fact have evidence to justify those tactics.

Finally, had the motion been filed the evidence would have been preserved for the record. If the ruling had been adverse to the State, the rape-shield statute permits the prosecutrix to confer privately with the prosecuting attorney and permits the State to take an interlocutory appeal. A principal reason for the unusual difficulty we have experienced in ruling on this appeal is that the defense has not yet disclosed exactly what its testimony might be. We have dealt with an issue without full knowledge of

the facts. If the defense testimony were before us, the issue would be clear-cut. Absent the required motion, the trial court's decision has not been shown to be wrong.

I would grant rehearing and affirm the judgment.

DUDLEY, J., joins in this dissent.