(No. 50830.—
(No. 50901.—

(No. 51044.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CHARLES ROBINSON, Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JOE ISHMAN *et al.,* Appellees.—THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. NICK CHARLES FREEMAN, Appellant.

*Opinion filed Oct. 2, 1979.—Modified on denial of rehearing Feb. 1, 1980.*

Robert Agostinelli, Deputy Defender, of Ottawa (Gary R. Garretson, Assistant Defender, of counsel), for appellant.

William J. Scott, Attorney General, of Springfield, and Edward Petka, State's Attorney, of Joliet (Donald B. Mackay, Melbourne A. Noel, Jr., and Thomas C. Crooks, Assistant Attorneys General, of Chicago, of counsel), for the People.

William J. Scott, Attorney General, of Springfield, and Clyde L. Kuehn, State's Attorney, of Belleville (Donald B. Mackay, Melbourne A. Noel, Jr., and Thomas C. Crooks, Assistant Attorneys General, of Chicago, and Raymond F. Buckley, Jr., of the State's Attorneys Appellate Service Commission, of Mt. Vernon, of counsel), for the People.

John H. Reid, Deputy Defender, of the Office of the State Appellate Defender, of Mt. Vernon, for appellees.

Richard J. Wilson, Deputy Defender, of the office of the State Appellate Defender, of Springfield (Donald T. McDougall, Assistant Defender, of counsel), for appellant.

William J. Scott, Attorney General, of Springfield, and Thomas J. Difanis, State's Attorney, of Urbana (Donald B. Mackay, Melbourne A. Noel, Jr., and Thomas C. Crooks, Assistant Attorneys General, of Chicago, of counsel), for the People.

MR. CHIEF JUSTICE GOLDENHERSH delivered the opinion of the court:

These consolidated cases present the question whether alleged conflicts of interests on the part of their public defender trial attorneys served to deprive defendants of the effective assistance of counsel.

In cause No. 50830, defendant Charles Robinson and Beverly Wilder were charged, by information, in the circuit court of Will County, with the burglary (Ill. Rev. Stat. 1975, ch. 38, par. 19—1) of a tavern. Following their arraignment, Alex Bonds, a part-time Will County public defender, was assigned to represent Robinson. Bonds disclosed that in the previous year his private law firm had represented James Witt in the purchase of the tavern business allegedly burglarized by defendant. Although Bonds no longer had any professional relationship with Witt, the latter still owed some portion of his attorney's fee. After being informed by the circuit court of the possible conflict of interest, Robinson agreed to accept representation by another assistant public defender. Wilder's motion for severance was allowed.

The evidence adduced at trial showed that at about 4:25 a.m. police found defendant and Wilder, who had gained entry through a broken window, inside the tavern preparing to remove several bottles of liquor and a television set. Witt testified that as the lessee of the tavern he had not given defendant authority to be in the tavern after closing. Defendant was found guilty of burglary and sentenced to the penitentiary.

The appellate court rejected defendant's contention that a *per se* conflict of interest extended to all members of the public defender's staff because of Bonds' prior representation of the burglary victim, and affirmed the judgment. (*People v. Robinson* (1978), 59 Ill. App. 3d 514.) We allowed defendant's petition for leave to appeal.

In cause No. 50901, defendants Joe Ishman and Reginald Bogay, and Sherwin Haywood, were indicted in

the circuit court of St. Clair County for the murder of an employee of the P & K Wholesale House. A witness who was a customer in the wholesale house at the time of the shooting testified that three young men, two of whom were armed, entered the premises and demanded money. After a brief scuffle between an employee and one of the robbers, the robber's pistol fired, fatally wounding the employee. The St. Clair County public defender was appointed to represent the three defendants and assigned separate assistant public defenders to represent defendants Ishman and Bogay; the public defender himself represented Haywood. Ishman's motion to sever his trial because of "irreconcilable differences" in the three men's defenses was granted. A severance was also granted to Haywood, who was later acquitted.

At his trial Bogay testified that he, Ishman, and Haywood had planned the robbery of the wholesale house, but that on entering the building he decided to withdraw from the crime. Ishman, according to Bogay, took Bogay's pistol and pushed him forward. Bogay said he then fled, hearing the fatal shot as he left. As he ran toward Ishman's car, Bogay was struck by buckshot fired by another employee of the wholesale house.

Ishman, who was arrested while attempting to use a credit card issued to one of the robbery victims, gave police a statement admitting his involvement in the robbery and implicating Bogay. In the statement, later introduced at trial, Ishman said that he remained near the door of the wholesale house while Bogay, carrying a pistol, and Haywood, with a sawed-off shotgun, approached the two men inside the business. During his trial, however, Ishman repudiated the statement, testifying that he signed it only after being beaten and threatened by the police. Ishman testified that he had bought the credit card from Bogay on the street for $20 and denied any knowledge of the robbery or murder.

In separate jury trials, Bogay and Ishman were found

guilty of murder and sentenced to the penitentiary. The cases were consolidated on appeal, and the appellate court reversed the convictions; remanding for new trials at which defendants were to be represented by counsel other than the public defender. (*People v. Ishman* (1978), 61 Ill. App. 3d 517.) The appellate court reasoned that because of the defendants' adverse interests (each attempted to shift culpability to the other), the public defender could not fully exercise his independent professional judgment on behalf of each defendant. The court said, too, that the possibility of a conflict of interest was not obviated by the public defender's assignment of separate assistants to represent the defendants. We allowed the People's petition for leave to appeal.

Defendant Nick Freeman (cause No. 51044) and his codefendant, James Winston, were charged by information in the circuit court of Champaign County with the armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2) of a bookstore. The public defender of Champaign County was appointed to represent both Freeman and Winston. He personally undertook Freeman's representation and assigned an assistant public defender to represent Winston.

At trial a sales clerk at the bookstore testified that two men, one armed with a shotgun and the other with a pistol, entered the store and ordered him to open the cash register and a display case containing change. One of the men wore a ski mask, the other a nylon stocking over his head. The attendant identified Freeman as being the robber whose face was covered by the nylon stocking. Another witness, a resident of the neighborhood where the bookstore was located, testified that he noticed an unfamiliar car in the area at the time of the robbery and saw two men run from the bookstore. The men were running in a "military fashion," ducking down, weaving and hiding. He reported to the police the license number of the car, which was later found in a trailer park. One of the investigating officers testified that a recent snowfall

enabled him to track a set of footprints from the car to a shed, where he found a toy pistol and a shotgun of the type used in the bookstore robbery. The officer testified that another set of footprints led from the car to the trailer where he saw Freeman, Winston and two women. In the trailer he found a pair of shoes which matched one set of footprints. The shoes were damp on the bottom and had water on the edges. For reasons not clear from the record, Freeman was not arrested until two days later. The officer testified further that he read Freeman his "rights" from a "Miranda Warning Card" and while questioning him he admitted to the armed robbery but remained silent as to his accomplice's identity. Neither Freeman nor Winston testified at trial.

The jury found Freeman guilty of armed robbery; Winston was acquitted. The appellate court held that although both defendants were represented by one entity (the public defender), their defenses were not antagonistic and the errors allegedly stemming from the joint representation were not prejudicial, and affirmed. (*People v. Freeman* (1978), 60 Ill. App. 3d 794, 799.) We allowed defendant Freeman's petition for leave to appeal.

Simply stated, the question here presented is whether the individual attorneys employed in the office of a public defender are members of an entity subject to the generally recognized rule that if an attorney is disqualified by reason of a conflict of interest that no other partner or associate of his firm may continue with the representation. (*People v. Fife* (1979), 76 Ill. 2d 418, 425; *Laskey Bros. of W. Va., Inc. v. Warner Bros. Pictures, Inc.* (2d Cir. 1955), 224 F.2d 824, 826-27; ABA Code of Professional Responsibility, Disciplinary Rule 5–105(D) (1969).) Although recognizing the general applicability of the rule, the People argue that because of their significant differences from private law firms the same rule should not apply to public defenders' offices. They argue that the individual attorneys in the public defender's office owe no duty to the office,

but only to the individual defendants they represent. Also, the People note, the structure of public defender offices is often dissimilar to private law offices. This State has no statewide public defender system (Ill. Rev. Stat. 1977, ch. 34, par. 5601 *et seq.*), and there are substantial differences in the organization of public defenders' offices throughout the State; in at least one county the "office" of public defender exists in title only, with the individual attorneys being but nominally members of the same office. In such a county, the People contend, any analogy between the public defender's "office" and a private law firm is completely invalid.

Even if an appearance of impropriety exists because of the representation of adverse interests by the public defender's office, the People continue, it is outweighed by the strong public policy favoring professional defender representation of indigents. In support of this contention are cited statistics showing that most judges and attorneys in Illinois favored a full-time public defender system over an assigned counsel system; that many Illinois attorneys assigned to criminal cases thought themselves incompetent to represent their clients and nearly all felt imposed upon; and that the 78 counties in Illinois with public defender services have committed several million dollars in salaries alone. Creation of a *per se* rule disqualifying the public defender's office from representing conflicting interests, the People posit, will weaken public defenders' offices, while leaving indigent defendants with often less experienced assigned counsel costing the State more.

Although this court has not previously done so, other jurisdictions have considered the question whether a public defender's office is a "firm" within the generally recognized canon which directs that if an attorney is disqualified by reason of conflict of interest no member of his firm may continue in the representation. In *Turner v. State* (Fla. App. 1976), 340 So. 2d 132, the court held that the public defender's office of a circuit

was such a "firm." In *Commonwealth v. Via* (1974), 455 Pa. 373, 316 A.2d 895, the Supreme Court of Pennsylvania held that the petitioner in a prior post-conviction proceeding in which the petitioner was assigned counsel who was a member of the same public defender's office which had represented him at trial did not waive the failure to assert incompetency of trial counsel. The rationale of the decision was that the law "will not assume that counsel has advised his clients of his inadequacies or those of his associates." Legal aid societies and similar public service offices have been held, for the purposes of determining whether there were conflicts of interests, to be similar to a private law firm. (*Estep v. Johnson* (D. Conn. 1974), 383 F. Supp. 1323; *Allen v. District Court* (1974), 184 Colo. 202, 519 P.2d 351; *Borden v. Borden* (D.C. 1971), 277 A.2d 89; *State v. Stevenson* (1978), 200 Neb. 624, 264 N.W.2d 848; *Commonwealth v. Westbrook* (1979), 484 Pa. 534, 400 A.2d 160.) In *Borden,* both parties in a divorce suit were represented by attorneys from the same legal aid office. Holding that representation of adverse interests by members of the same office was improper, the court found that "Lawyers who practice their profession side-by-side, literally and figuratively, are subject to subtle influences that may well affect their professional judgment and loyalty to their clients, even though they are not faced with the more easily recognized economic conflict of interest." (277 A.2d 89, 91.) The court concluded that it was "reluctant ever to make an exception from the professional norm for attorneys employed by the government *** because then we might encourage a misapprehension that the special nature of such representation justifies departure from the profession's standards. We should always avoid any action that would give the appearance that government attorneys [footnote—indicating that this included the public defender—omitted] are 'legal Hessians' hired 'to do a job' rather than attorneys at law." (277 A.2d 89, 92-93.)

Although *Borden* did not involve, as do the present cases, the additional considerations required by the constitutional right, both Federal and State, to effective assistance of counsel, the court's analysis is equally relevant here.

Further support for the position that no distinction is to be drawn between attorneys in private practice and those employed by the State is found in the American Bar Association Standards Relating to the Administration of Criminal Justice. Section 3.9 of the ABA Standards, The Defense Function (1971), provides that "once a lawyer has undertaken the representation of an accused his duties and obligations are the same whether he is privately retained, appointed by the court, or serving in a legal aid or defender system."

In support of their position, the People cite *People v. Wilkins* (1971), 28 N.Y.2d 53, 268 N.E.2d 756. The New York Court of Appeals there held that the New York City Legal Aid Society's representation of both the defendant and, by a different attorney and in an unrelated criminal trial, the complaining witness, did not deprive defendant of the effective assistance of counsel. The size of the legal aid society (it employed over 150 lawyers for criminal defense alone), the court said, made it unlikely that, as in a law firm, information concerning clients flowed freely within the office; consequently, the court would not impute knowledge from one attorney in the society to another. The court added that because the defendant had not shown his attorney was inhibited or restrained during trial, it would not infer prejudice.

Insofar as *Wilkins* was predicated on the absence of prejudice to the defendant, it has no relevance to these cases for the reason that this court has held that when a defendant's attorney is burdened with a conflict of interest, actual prejudice need not be shown. (*People v. Stoval* (1968), 40 Ill. 2d 109.) To the extent that the decision in *Wilkins* was premised upon the size of the agency providing legal services, we do not agree. A number of

private law firms now employ literally scores of attorneys, yet it could not seriously be contended that a law firm of such size could properly represent adverse interests in a single case. Also, as we have already indicated, great discrepancies exist in the size and organization of this State's public defender offices. They range from the Cook County public defender's office, with nearly 300 full-time attorneys, to many smaller offices employing only a few full- and part-time lawyers. While it might be possible to distinguish, as was done in *Wilkins,* an office like that of the Cook County public defender from private law firms, smaller public defender offices like those in the present case are, structurally and quantitatively, similar to private law firms composed of a senior member and one or more salaried associates.

The People's conclusion that attorneys in the public defender's office have no allegiance to their office has been implicitly rejected in *People v. Smith* (1967), 37 Ill. 2d 622. In *Smith* the defendant had been represented at trial by an attorney from the public defender's office. After his conviction, the defendant filed a *pro se* petition alleging that his trial counsel was incompetent; another attorney from the same office was appointed to represent defendant in the post-conviction proceedings. Although the court restricted its holding to the circumstances present in that case, in finding a conflict of interest it was nonetheless acknowledged that an attorney from the public defender's office might feel some loyalty to the office since the attorney's "natural inclination would be to protect its reputation by defending against the charges of incompetency ***." 37 Ill. 2d 622, 624.

Upon review of the authorities and consideration of the diversity of organization of the offices of the public defenders, we conclude that the avoidance of conflicts of interest which result in failure to provide effective assistance of counsel does not require us to hold that the individual attorneys who comprise the staff of a public

defender are members of an entity which should be subject to the rule that if one attorney is disqualified by reason of a conflict of interest then no other member of the entity may continue with the representation. In many instances the application of such a *per se* rule would require the appointment of counsel with virtually no experience in the trial of criminal matters, thus raising, with justification, the question of competency of counsel. Balanced against this is the possibility, in most instances quite remote, that an experienced member of the public defender's staff might labor under a conflict of interest because another member of the staff was so burdened. We find apposite the commentary to the American Bar Association Standards Relating to the Defense Function (Standard 3.5, Conflict of interest) which states:

> "The basic rule which must guide every lawyer is that his total loyalty is due each client in each case; and he may never permit the pressing of one point or one case to be guided or influenced by the demands of another case. The risk of jeopardizing other cases, if it in fact exists, presents a conflict he must resolve in such a way that his immediate responsibility is faithfully discharged. This problem is one of the arguments frequently made against the desirability of a full-time defender agency. Those who have studied voluntary and public defender offices have concluded that the inbred adversary tendencies of the lawyers are sufficient protection. See Special Comm'n of the Ass'n of the Bar of the City of N. Y. & the Nat'l Legal Aid and Defender Ass'n, Equal Justice for the Accused 61, 71, 74 (1959). In the sphere of private representation and in institutionalized prosecution offices many of these risks are present in some degree. Here, too, the innate competitive instincts of an advocate and the integrity of the bar is society's protection." ABA Standards, The Defense Function. Commentary, at 212-13 (1971).

In our opinion the decisions of the Supreme Court and this court (see *Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457; *Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173; *People v. Stoval* (1968), 40 Ill. 2d 109; *People*

*v. Kester* (1977), 66 Ill. 2d 162; *People v. Berland* (1978), 74 Ill. 2d 286; *People v. Vriner* (1978), 74 Ill. 2d 329) furnish guidance adequate to avoid conflicts of interest which will impede the furnishing of effective assistance of counsel.

We turn now to a consideration of the facts and circumstances of these consolidated cases.

In cause No. 50830 the conflict of interest arose because the public defender assigned to represent defendant Robinson had previously represented James Witt, the People's witness who was the lessee of the tavern which defendant was charged with burglarizing. Under these circumstances there arose "the possibility that the attorney might be subject to subtle influences which could be viewed as adversely affecting his ability to defend his client in an independent and vigorous manner." (*People v. Kester* (1977), 66 Ill. 2d 162, 167.) In a case involving an assigned counsel's representation of both the defendant and the theft victim, the Court of Appeals for the Fifth Circuit stated:

> "The victim of a crime is not a detached observer of the trial of the accused, and his 'private attorney' is likely to be restrained in the handling of that client/witness. In a similar case, the court observed: 'It takes no great understanding of human nature to realize that the individuals who have been burglarized might be less than happy and might go so far as to remove the attorney from their good graces if this defendant were acquitted or received a light sentence or were placed on probation.' United States v. Myers, E.D. Pa. 1966, 253 F. Supp. 55, 57." *Castillo v. Estelle* (5th Cir. 1974), 504 F.2d 1243, 1245.

Although Witt's testimony merely confirmed that the tavern was in a normal condition when he left, that he had not given defendant permission to be inside the tavern, and that a television set had been moved from its customary

location, it is unnecessary for a defendant to show that his attorney's conflict caused him actual prejudice. (*People v. Stoval* (1968), 40 Ill. 2d 109.) It therefore seems clear that had Bonds continued in the representation of defendant, a conflict of interest might have existed which, absent other circumstances, could deprive defendant of his right to effective assistance of counsel. See generally Annot., 27 A.L.R.3d 1431, 1438-40 (1969).

*United States v. Jeffers* (7th Cir. 1975), 520 F.2d 1256, *cert. denied* (1976), 423 U.S. 1066, 46 L. Ed. 2d 656, 96 S. Ct. 805, cited by the People, is not apposite. The defendant in that case was represented by an attorney whose firm had represented a prosecution witness in an earlier criminal trial. In holding that the defense counsel's dual representation did not constitute a conflict of interest, the court of appeals emphasized that the case did not involve "an existing personal relationship" between the attorney and the prosecution witness. (520 F.2d 1256, 1263-64.) By contrast, in *Robinson* the relationship between attorney and client was active in that at the time of defendant's trial the prosecution witness still owed legal fees to the assistant public defender.

The People contend that if any conflict of interest existed by reason of defendant's being represented by another assistant public defender, it was knowingly and intelligently waived by defendant. The record shows that immediately before Robinson and Wilder were to be tried, the circuit court informed them of Witt's expected testimony and of his previous representation by Bonds. The consequences of the possible conflict of interest were also explained:

> "THE COURT: See, I want it crystal clear to you that I don't know what this witness is saying is true or false or anything else but I want the lawyer that represents you to be free to tear him up like hamburger, rip him off, make a liar out of him if he can do so. Do you understand that?
> DEFENDANT WILDER: Yes.

THE COURT: I want him to be completely free and have no—I don't want him to hold back anything in your behalf, do you understand that? So, we have all agreed that we will not let Bonds serve. But the question is whether you'd have any objection to Mr. Andreano getting another Public Defender and this one being a full time one. Not no connection with Bonds, his only connection would be that he also works for the Public Defender's office but he's a full time man in the office. Do you understand that, Mr. Robinson?

DEFENDANT ROBINSON: Yah.

THE COURT: Do you have any objection to this other man being appointed by Mr. Andreano?

DEFENDANT ROBINSON: He may be influenced—

THE COURT: Pardon?

DEFENDANT ROBINSON: He may be make an influence.

THE COURT: I'm sorry—

MR. RUDMAN [assistant State's Attorney]: He may get influenced.

THE COURT: May get influenced?

DEFENDANT ROBINSON: Yes.

THE COURT: How about you, Mrs. Wilder?

DEFENDANT WILDER: Makes me no difference.

THE COURT: Makes no difference to you. Well, Mr. Robinson you think that there is a possibility Mr. Phelan may be influenced by Mr. Bonds?

DEFENDANT ROBINSON: Yes, it's a possibility.

THE COURT: Well, the reason I brought this all to your attention is I want you to understand what is going on and if you have any objection then what I'm going to do then, I'm going to relieve Mr. Andreano, the Public Defender's office. Now, that's going to put me in a position of giving you a new lawyer and in your trial, it's your trial date now and you'll get a new lawyer in. Now, he may need time to prepare it. He may not be ready to go to trial promptly. Do you understand that?

DEFENDANT ROBINSON: Yah.

THE COURT: Under no circumstances, you may be faced with the choice of whether to ask for a continuance, do you understand?

DEFENDANT ROBINSON: Yep.

THE COURT: And if you ask for a continuance

you will be giving up and waiving your right to a speedy trial, do you understand that?

DEFENDANT ROBINSON: Yep.

THE COURT: Your trial has to commence within 120 days of your arrest which is tomorrow. Do you understand that?

DEFENDANT ROBINSON: Yep.

THE COURT: And you still feel that you would rather have somebody outside that office and there is no possibility of any influence—

DEFENDANT ROBINSON: Repeat that question again.

THE COURT: Pardon?

DEFENDANT ROBINSON: Repeat the question.

THE COURT: Well, the question is, Mr. Andreano offered to get Mr. Phelan [a full-time assistant public defender] in to replace Mr. Bonds. Do you understand that?

DEFENDANT ROBINSON: Yep.

THE COURT: And you said there is always a possibility of some kind of influence—

DEFENDANT ROBINSON: Yep.

THE COURT: And if you feel that way, then we are going to get you somebody completely un-associated with the Public Defender's office. If that's the way you feel. Because you are the one that has to make the choice. I am only advising you that your 120 days will be up, you[r] trial has to start tomorrow and this new lawyer that I bring in, he may need more than one day to familiarize himself with the case. He may say, I need more time and you are going to be faced with— You have a right to demand that your trial start and if your trial starts you may be faced with a lawyer that's not in a position to properly defend your case for lack of time. Do you understand that?

DEFENDANT ROBINSON: Yep.

THE COURT: So, knowing that, Mr. Robinson, do you want to get a new and different lawyer not connected with the Public Defender's office or do you want to get another lawyer from the Public Defender's office?

DEFENDANT ROBINSON: I'll keep the one I got.

THE COURT: You want to keep the one you got now?

DEFENDANT ROBINSON: Yah.

THE COURT: Now, you mentioned just a few minutes ago that maybe Mr. Phelan will be influenced by Mr. Bonds. Now, you have reconsidered that view, Mr. Robinson?

DEFENDANT ROBINSON: Yah.

THE COURT: And you now want to accept Mr. Phelan do you?

DEFENDANT ROBINSON: Yah."

Phelan withdrew and defendant was thereafter represented by Daniel Kallan, another full-time assistant public defender. On the following day, April 21, 1976, the trial court was told that two other part-time assistant public defenders had also done legal work for Witt. On that day defendant's attorney, Kallan, asked that the court inform defendant of the problem confronting him: "I think Mr. Robinson has a choice to make and I want that choice made known to the defendant, that he has to choose between Constitutional right to a speedy trial or his effective assistance of counsel and I want that made known to him in the court." The record shows the following colloquy:

"THE COURT: Now, the situation we are faced with is this, you have to agree and consent to accept these attorneys because if you have any reservation in your mind, any feeling they are not going to do a job for you and you alone, the right way and anything wrong with this situation, if you would say that to me, I'll give you another and different lawyers. I have already contacted Mr. Gray. Now, I'm willing to give you—I would just go ahead and give you a different lawyer except for this problem I'll put up against you which I told you about yesterday. If I do give you a different lawyer and call Mr. Gray up, Mr. Gray is going to have to go to trial today but if you and he talk about this case and he says, well, I'd rather have a little more time to try this case. Then you are going to be forced to ask for a continuance on your case. If you ask for a continuance on your case, you'll be breaking what we call the 120 day rule. The 120 day rule is in effect says this, if your trial don't start on the 120th day, we have to turn you loose and give you a complete

pass on this offense. Do you understand that?

DEFENDANT ROBINSON: Yep.

THE COURT: In other words, Mr. Robinson, today is the 120th day, if this trial doesn't start today, you are home free in this offense, do you understand that?

DEFENDANT ROBINSON: Yah.

THE COURT: Now, if I'm going to bring you a new lawyer today, the lawyer could say, I'll go ahead Judge and if he goes ahead, he won't have a lot of time to prepare. If he doesn't want to go ahead, you are going to be forced to ask for a continuance. Do you understand that?

DEFENDANT ROBINSON: Yep.

THE COURT: Now, the other thing you will be doing is breaking your 120 day rule, if you ask for a continuance and the court can—we can set another time for this case and you will continue to remain in custody until that additional time, do you understand that?

DEFENDANT ROBINSON: Yah.''

After explaining the computation of the 120-day period, the trial judge again received defendant's answer that he wished to continue to be represented by the public defender's office:

"THE COURT: Do you want to have Mr. Kallan as your attorney or do you want me to get you another attorney from outside the Public Defender's office?

DEFENDANT ROBINSON: He'll do.

THE COURT: He'll do, now, you understand that he works for Mr. Andreano, the Public Defender, don't you?

DEFENDANT ROBINSON: Yep.

THE COURT: You understand Mr. Bonds also works for Mr. Andreano, the Public Defender, don't you?

DEFENDANT ROBINSON: Yes.

THE COURT: You understand Mr. Murer and Kozlowski work for Mr. Andreano, don't you?

DEFENDANT ROBINSON: Yep.

THE COURT: You understand that they represented Mr. James Witt, you understand that?

DEFENDANT ROBINSON: Yep.

THE COURT: Knowing that you still want to accept Mr. Kallan?

DEFENDANT ROBINSON: Yep.''

The sixth amendment right to effective assistance of counsel is subject to waiver. (*United States v. Alvarez* (5th Cir. 1978), 580 F.2d 1251; see *Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457; *People v. Friedrich* (1960), 20 Ill. 2d 240.) A waiver of this fundamental right, however, should not be casually inferred (*Glasser v. United States* (1942), 315 U.S. 60, 70, 86 L. Ed. 680, 699, 62 S. Ct. 457, 465; *People v. Fife* (1979), 76 Ill. 2d 418), and must be knowingly and intelligently made (*Johnson v. Zerbst* (1938), 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1023). Indeed, some courts have questioned (in the context of representation of multiple defendants) whether most defendants possess the legal sophistication to weigh the alternatives and intelligently abandon the right to conflict-free counsel. *Campbell v. United States* (D.C. Cir. 1965), 352 F.2d 359, 360; *United States v. Garafola* (D.N.J. 1977), 428 F. Supp. 620, 623; Geer, *Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney,* 62 Minn. L. Rev. 119, 140-42 (1978); see *People v. Stoval* (1968), 40 Ill. 2d 109, 114.

The record shows that the circuit court thoroughly and carefully informed Robinson of the circumstances producing the possible conflict of interest and explained to him the possible harm that could result to his defense. This was in marked contrast to what occurred in *People v. Stoval* (1968), 40 Ill. 2d 109, where the circuit court merely advised defendant of the conflict of interest and made no effort to explain its significance or in what manner it might affect counsel's representation. Defendant appears to have understood the problem and freely chose to proceed with an assistant public defender as his counsel. Assuming the possibility of conflict, in view of its attenuation here, defendent's decision does not appear imprudent.

Defendant contends that he could not knowingly and intelligently waive his counsel's conflict of interest because

he was misled by the trial court's information; irrespective of whether he chose private counsel or the public defender, the 120-day speedy trial period was quite unlikely to expire. This is so, defendant alleges, since his trial counsel had filed a motion on April 20, 1976, to sever defendant's trial from that of his codefendant, thereby tolling the period. (Ill. Rev. Stat. 1975, ch. 38, pars. 103—5(a), (f); *People v. Lee* (1969), 44 Ill. 2d 161.) A jury panel was, at the time of his waiver, ready for the trial to begin; and, absent any evidence to the contrary, it may be presumed that the People were prepared for trial. These facts, defendant contends, must have been made known to him before he could make a knowing and intelligent waiver.

We are not persuaded by defendant's argument. In advising defendant of the conflict, the circuit court acted at the request of defendant's counsel that defendant should be told in court of his choice "between [the] Constitutional right to a speedy trial or his effective assistance of counsel." Defendant's appellate counsel concedes that the information given defendant by the trial court was correct, but argues that it was incomplete. The more complete warning now urged would, however, have required some prescience on the part of the circuit court. At the times defendant was admonished (both on April 20, 1976, and on April 21, 1976) the motion for severance had not yet been filed. Although the clerk's stamp indicates that it was filed on April 20, 1976, the transcript shows that it was first made orally on April 21, 1976, subsequent to defendant's second admonition. Had defendant's attorney indicated at an earlier time an intention to file the motion, the circuit court might have advised the defendant concerning its effect, but the court was not required to admonish defendant concerning actions which had not yet been taken. We hold that defendant made a knowing and intelligent waiver, and the judgment is affirmed.

In both cause No. 50901 and cause No. 51044 the alleged conflict of interest arose from the public defender's representation of codefendants. Because we have here held that a conflict of interest on the part of one lawyer on the public defender's staff does not *per se* serve to disqualify other lawyers associated with that office, it must be determined from the record whether a conflict, in fact, existed. Relevant to that determination is the rationale for limiting, or in some instances proscribing, joint representation of codefendants. While joint representation of multiple criminal defendants is not *per se* violative of the guarantee of effective assistance of counsel (*Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173; *People v. Berland* (1978), 74 Ill. 2d 286, 305), it frequently presents the potential for denial of that right. Several commentators have criticized the practice (Geer, *Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney,* 62 Minn. L. Rev. 119 (1978); Hyman, *Joint Representation of Multiple Defendants in a Criminal Trial: The Court's Headache,* 5 Hofstra L. Rev. 315 (1977); Note, *Criminal Codefendants and the Sixth Amendment: The Case for Separate Counsel,* 58 Geo. L.J. 369 (1969)). Section 3.5(b) of ABA Standards, The Defense Function (1971), provides:

"Except for preliminary matters such as initial hearings or applications for bail, a lawyer or lawyers who are associated in practice should not undertake to defend more than one defendant in the same criminal case if the duty to one of the defendants may conflict with the duty to another. The potential for conflict of interest in representing multiple defendants is so grave that ordinarily a lawyer should decline to act for more than one of several co-defendants except in unusual situations when, after careful investigation, it is clear that no conflict is likely to develop and when the several defendants give an informed consent to such multiple representation. In some instances, as defined in the Code of Professional Responsibility, accepting or continuing employment by

> more than one defendant in the same criminal case will constitute unprofessional conduct."

Some would ban multiple representation almost entirely. (See *United States v. Mari* (2d Cir. 1975), 526 F.2d 117, 120-21 (Oakes, J., concurring).) We note that proposed Rule 44(c) of the Federal Rules of Criminal Procedure provides:

> "Rule 44. Right to and assignment of counsel.
>
> \* \* \*
>
> (c) Joint representation.—Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel."

In cause No. 50901 defendants Ishman and Bogay, both represented by the public defender's office, developed inconsistent defenses. Bogay admitted that he was present with Ishman and Haywood at the scene of the robbery-murder, but claimed that he fled before the murder occurred. Ishman, on the other hand, denied any knowledge of the murder, testifying that he purchased from Bogay the robbery victim's credit card that led to his arrest. The trials of these defendants were severed and they and Haywood were represented by different members of the public defender's staff.

We have held that to prevail on a claim of ineffective assistance of counsel due to joint representation, a defendant must show "an actual conflict of interest manifested at trial \*\*\*." (*People v. Berland* (1978), 74 Ill. 2d 286, 299-300; *People v. Vriner* (1978), 74 Ill. 2d 329, 340-41.) Mere hypothetical or speculative conflicts will not suffice.

(*People v. Berland* (1978), 74 Ill. 2d 286, 301.) To meet this burden, Ishman contends that in order not to prejudice the later sentencing of Bogay his trial attorney failed to elicit testimony favorable to his defense. At Ishman's sentencing hearing the following colloquy occurred between Ishman's counsel and the assistant State's Attorney who prosecuted the case:

> "MR. WHARTON [Ishman's counsel]: Mr. English, I am, going to ask you prior to the testimony of one Mr. Schneider who was a witness to the alleged incident, did you out of the hearing of the jury conduct a conference between Mr. Schneider, yourself, and myself?
>
> MR. ENGLISH [assistant State's Attorney]: If you can remember it. I am sure we did. But you will have to—what was it about?
>
> Q. This was concerning certain matters that he was not to go into when he testified. You know what I am looking—
>
> A. You want me to say what we got on Ishman?
>
> Q. What did he say?
>
> A. It is the opinion and as I took over the case we didn't know who the trigger man was originally. They thought it was Reginald Bogay, and if the court will remember the testimony he is the one that carried the money in. I talked with both Mr. Schneider and Komechek [*sic*] and I don't know how Paul Komechek [*sic*] would know but I think the evidence in court not present but it would be their opinion and to this day Mr. Schneider would not.
>
> Q. What? What did he say?
>
> A. He would say Bogay was the trigger man."

The failure at Ishman's trial to offer the foregoing testimony cannot be attributed to a conflict of interest. Identification of Bogay as the "triggerman" was, as the People point out, irrevelant to Ishman's defense that he was not a participant in the offense. Indeed, evidence concerning what had occurred at the murder scene may well have been detrimental to that defense. The records show that each defendant received vigorous representation from his separate counsel, and we are unable to discern

any indication that the defense of either of them was inhibited to any degree because of the alleged joint representation. We hold, therefore, that the appellate court erred in holding that the *per se* conflict required reversal of the convictions.

In cause No. 51044, the defenses of the two defendants on trial were not antagonistic. The evidence against Freeman consisted of testimony concerning his admissions of guilt in the armed robbery, the bookstore clerk's identification, and the footprints leading from Freeman's car to the shed where the two guns were found. By contrast, the only circumstances linking Winston to the crime were the footprints and the similarity of the toy pistol used in the robbery to one owned by his son. Apparently in an effort to demonstrate the contrast in the evidence against Winston and the greater amount of evidence against Freeman, the public defender representing Winston asked repeatedly on *voir dire,* "Do you believe that a person who is found associated with someone who commits a criminal act is therefore also somewhat responsible for it?" No objection was made by the assistant public defender representing Freeman. Appellate counsel contends that the failure to object is evidence of the conflict of interest under which the trial attorney labored. Appellate counsel also points to the following statement made by Freeman's attorney during closing argument:

> "One word about Mr. Winston, who is not my client, before I start. I would submit to you that the evidence in this particular case is very much lacking as to this particular individual and a verdict of guilty as to Mr. Winston would appear to be a travesty of justice and I will confine my arguments from this point on as to my client, Nick Freeman."

The People concede that the argument was "ill-conceived," but maintain that it is not evidence of a conflict of interest and was not prejudicial to defendant Freeman. Defendant argues that when there is a difference in the quantum of evidence with respect to codefendants "a natural strategy

is to appeal to the jury to compromise by finding one guilty and thus satisfying a fundamental human desire for vindication and retribution; and then also to do further justice by finding a 'reasonable doubt of guilt' as to the other defendant."

Upon examination of the record we agree with the appellate court that no conflict of interest has been shown as a result of the representation of these defendants by two attorneys associated with the public defender's office. The question posed on *voir dire* did not stem from this representation and may as well have been asked by counsel with no prior association. The comment made in final argument appears to have been made for the purpose of demonstrating that there was no evidence whatsoever as to Winston, and although admittedly the evidence was somewhat greater concerning Freeman, that it was not sufficient to justify a conviction. While we recognize that one of the hazards of joint representation is that evidence beneficial to one defendant will not be offered (*People v. Rose* (1932), 348 Ill. 214), to conclude that this argument in any manner arose from any desire or effort to aid Winston by reason of his representation by the public defender's office would rest on conjecture and speculation. The judgment of the appellate court is affirmed.

For the reasons stated, in cause No. 50830, the judgment of the appellate court is affirmed; in cause No. 50901 the judgment of the appellate court is reversed and the judgment of the circuit court is affirmed; and in cause No. 51044 the judgment of the appellate court is affirmed.

*50830 — Appellate court affirmed.*
*50901 — Appellate court reversed;*
*circuit court affirmed.*
*51044 — Appellate court affirmed.*