(No. 60905.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROCKY COATES, Appellant.

*Opinion filed October 18, 1985.—Rehearing denied December 2, 1985.*

SIMON, J., dissenting.

Steven Clark, Deputy Defender, and Richard Faust, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Joan S. Cherry and Frank C. Zelenzinski, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Rocky Coates, was convicted of child pornography (Ill. Rev. Stat. 1979, ch. 38, par. 11—20a) and indecent liberties with a child (Ill. Rev. Stat. 1979, ch. 38, par. 11—4(a)(3)) and sentenced to concurrent terms of 15 years in the penitentiary. The appellate court affirmed in a Rule 23 order (87 Ill. 2d R. 23; 126 Ill. App. 3d 1153), and we allowed defendant's petition for leave to appeal (94 Ill. 2d R. 315(a)).

The alleged victim of the crimes is the nine-year-old daughter of defendant's wife. The testimony shows that on the night of March 30, 1981, defendant went to the home of Stanley Snyder, a friend, and borrowed a Kodak instant camera capable of developing pictures instantaneously. Sometime after 3 a.m. on March 31, defendant returned home. The child testified that defendant came into the room where she was sleeping next to her 11-year-old sister and 10-year-old brother, awakened her, and told her to change into a shirt and a pair of red underpants. He pulled or dragged her to the bathroom, where he told her to lower her underpants to her knees. He then photographed her in a frontal standing position. Defendant placed her on the bathroom sink with her shorts pulled down to her ankles and his penis against her genital area, and took another picture. Defendant then dragged her into the living room, where he told her to hold his penis in her hand approximately one inch

from her mouth. He took three pictures of the victim in this position. Afterward, defendant gave her $5 and told her not to tell anyone what had happened. The child returned to bed and went to sleep. Defendant went into the room that he shared with the victim's mother.

In the morning the child's mother awoke her, her brother and her sister and sent them to school. After the children left for school defendant's wife discovered she had no baby formula. She returned to the room where defendant was sleeping and began to search through his pants pockets for some money. While looking through the pockets she found three pictures. One of the pictures showed her daughter with her undershorts pulled down to her ankles, one showed her holding a penis next to her face, and the third picture showed a penis next to the child's genital area. She obtained a butcher knife from the kitchen and brought it into the bedroom. She had raised the knife above defendant's body but when she heard the baby cry, she dropped the knife, lifted the baby out of its crib and left the apartment. She went to her mother's home and she and her mother went to the police station. After viewing the pictures the police told Mrs. Coates to return to her apartment, where she would be met by some other officers. When she arrived at her apartment, the police were already there. They found defendant sleeping. The police woke defendant and informed him he was under arrest, but before permitting him to dress, one of the officers searched through his pants pockets for weapons. While searching through one of his pockets the officer found two photographs which he later identified at trial as People's exhibit Nos. 7 and 8. Exhibit No. 7 appears to show a child's hand on a penis, and exhibit No. 8 is unclear. The arresting officer testified that he saw no butcher knife on the floor.

Defendant testified in his own behalf. He stated that

he had borrowed the Kodak instant camera several days earlier, on March 26, and had left it in his wife's car. One day between March 26 and March 30, he noticed it was gone from the car, but it had reappeared the next day. He testified that he took no pictures with it. He said that on March 30 he finished work at 10 p.m., went to a bar until 4 or 5 a.m., came home, and went to sleep. The next thing he knew he was being awakened by a police officer and was placed under arrest.

Defendant contends first that the circuit court erred in certain rulings concerning the records of defendant's wife, Nanette Coates, with the Department of Children and Family Services (DCFS). Defendant sought to subpoena the DCFS records and use them to impeach her testimony. It was defendant's theory that his wife, the mother of the alleged victim, had a history of problems with her children, which included child neglect and unfounded claims of sexual abuse by various boy friends and husbands. At a hearing, the DCFS authorities argued that pursuant to section 11 of the Abused and Neglected Child Reporting Act (Ill. Rev. Stat. 1981, ch. 23, par. 2061) the records were confidential and should not be disclosed to defense counsel. Concerning the reports of child abuse and neglect made to the DCFS under the provisions of the Abused and Neglected Child Reporting Act (Ill. Rev. Stat. 1981, ch. 23, par. 2051 *et seq.*), section 11 provides:

> "All records concerning reports of child abuse and neglect and all records generated as a result of such records, shall be confidential and shall not be disclosed except as specifically authorized by this Act or other applicable law. It is a Class A misdemeanor to permit, assist, or encourage the unauthorized release of any information contained in such reports or records." (Ill. Rev. Stat. 1981, ch. 23, par. 2061.)

> "A person shall have access to the records described in Section 11 only in furtherance of purposes directly

connected with the administration of this Act. Such persons and purposes for access include:

* * *

> (7) A court, upon its finding that access to such records may be necessary for the determination of an issue before such court; however, such access shall be limited to in camera inspection, unless the court determines that public disclosure of the information contained therein is necessary for the resolution of an issue then pending before it; ***." (Ill. Rev. Stat. 1981, ch. 23, par. 2061.1(7).)

The circuit court conducted an *in camera* inspection of the records without either defense counsel or the State's Attorney present and permitted defendant to use certain portions of the documents for impeachment purposes. Defendant contends that, in conducting the *in camera* inspection in the manner in which it did, the court deprived defendant of a fair trial under the sixth and fourteenth amendments of the United States Constitution and sections 2 and 8 of article I of the 1970 Illinois Constitution and, further, that its action was violative of the provisions of Supreme Court Rule 412(h) (87 Ill. 2d R. 412(h)). Relying on *People v. Dace* (1984), 104 Ill. 2d 96, and *People v. Phipps* (1981), 98 Ill. App. 3d 413, defendant argues that the records should have been examined in an *in camera* hearing attended by counsel for the People and defendant, at which time it should have been determined what information would be relevant and material to the issue of the witness' credibility.

*Dace* and *Phipps* are clearly distinguishable. Both cases presented the question whether the mental health records of prosecution witnesses were discoverable for purposes of impeachment. In neither opinion did the court purport to modify the rule that the determination of whether material is discoverable and subject to disclosure is to be made by the circuit court. The opinions are authority for the proposition that if either the witness or

the therapist seeks to invoke the statutory privilege, the appropriate procedure is for the court to hold an *in camera* hearing in the presence of counsel for both sides.

Defendant argues that the court erred in failing to comply with the provisions of Supreme Court Rule 415(f) (87 Ill. 2d R. 415(f)) in that it made no record of the proceedings *in camera* and failed to seal, impound and preserve the records involved. The record fails to show that defendant requested any such action, and under the circumstances, there is nothing before us for review.

Defendant contends next that the court erred in denying defense counsel's pretrial motion to withdraw because of a conflict of interest. Prior to trial, defense counsel, a member of the Cook County public defender's office, moved to withdraw from the case because of a conflict of interest. The basis of the alleged conflict was that his office was also representing the People's witness, the child's mother, in a child-custody case in juvenile court.

Defendant argues that the conflict arose because in the juvenile court case counsel was endeavoring to prove that Mrs. Coates was a fit person to have custody of the child, while in this case he was required to make an effort to prove that the charges against defendant were fabricated by the witness and made for an ulterior motive.

In *People v. Robinson* (1979), 79 Ill. 2d 147, the court held that, in determining whether a conflict of interest exists, individual attorneys who comprise the staff of the public defender, unlike members of a private law firm, are not members of an entity "which should be subject to the rule that if one attorney is disqualified by reason of a conflict of interest then no other member of the entity may continue with the representation." (79 Ill. 2d 147, 159.) The court stated that a case-by-case examination is necessary to determine whether any facts peculiar

to the case preclude the representation of the individuals whose interests were allegedly in conflict. Here, the only relationship between counsel appears to be the fact that both are employed by the public defender. No conflict is shown by the record, and nothing indicates that counsel's representation of defendant was in any manner inhibited. Under the circumstances shown by this record, the court did not err in denying counsel's motion to withdraw.

We consider next defendant's contention that the evidence failed to prove him guilty beyond a reasonable doubt. He contends that the photographic exhibits linking him to the incident are inconclusive and create a reasonable doubt of his guilt. He argues that his wife's reputation for fabrication, the evidence demonstrating her motive for fabrication, and her inconsistent and incredible trial testimony, rendered her an unbelievable witness. He contends, too, that the testimony of the alleged victim was less than clear and convincing, was uncorroborated, and was therefore not sufficient to support the convictions for indecent liberties with a child and child pornography.

It is not disputed that the child shown in the photograph is the complaining witness, but defendant denies that the penis in the photograph is his. He cites the testimony of Dr. John Raba that defendant was not circumcised and that the penis in the photographs was more than likely that of a circumcised male. This, he contends, renders the complaining witness' testimony unbelievable.

He argues, too, that the testimony shows that his wife, Nanette Coates, had previously fabricated charges of molestation against a live-in boy friend. He argues that because the Chicago police department and the DCFS investigated the complaint, found it to be groundless and filed no charges, her testimony in this case was entirely discredited.

The complainant's testimony on a charge of indecent liberties with a child should be either clear and convincing or substantially corroborated. (*People v. Kolden* (1962), 25 Ill. 2d 327.) If the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and create an abiding conviction that he is guilty of the crime charged, a reviewing court should reverse the judgment. *People v. Morgan* (1977), 69 Ill. 2d 200, 206-07.

The photographs in evidence are not particularly clear, but it can hardly be expected that photographs taken under the circumstances described by the child would be of the quality of those produced by professional photographers. The testimony of the complainant is corroborated by the testimony of the owner of the camera that defendant had borrowed it at 10 p.m. on that evening and that at that time it contained four or five unexposed films. Her testimony is further corroborated by the finding of the pictures in defendant's pockets by his wife and the police officer. Under the circumstances we hold that there is sufficient evidence to sustain the convictions for both offenses.

Finally, defendant contends that the circuit court erred in denying his motion for a mistrial. He asserts that in cross-examination the People asked him a series of questions insinuating that he battered his wife and step-children and did not support them and then, despite his specific denials of such misconduct, failed to produce any evidence thereof. At the conclusion of rebuttal defendant moved for a mistrial and contends that the failure to grant the motion was reversible error.

The record shows that defendant was asked whether he had struck his wife or any of the children during the course of an argument to which he referred in direct examination or whether he had ever struck any of the children. The People argue that in direct examination

defendant had insinuated that the charges against him were fabricated by his wife because of an argument about her failure to keep their apartment clean; that the interrogation was intended to clarify and probe the truth and probability of these insinuations and was within permissible bounds.

The record shows that defendant denied the charges and attempted to attribute to his wife a motive for having fabricated them. In our opinion, the questions of which he complains were properly directed toward probing the credibility of those insinuations. The circuit court is vested with substantial discretion to determine the scope of cross-examination (*People v. Coles* (1979), 74 Ill. 2d 393, 395-96), and the record reflects neither abuse of discretion in permitting the cross-examination nor error in denying defendant's motion for mistrial.

For the reasons stated, the judgment is affirmed.

*Judgment affirmed.*

JUSTICE SIMON, dissenting:

I disagree with the majority's approval of an examination by the trial judge *in camera* and outside the presence of counsel of documents which a defendant has a constitutional right to use in his defense. Rocky Coates was convicted almost solely on the basis of testimony offered by his former wife, Nanette Coates, and her daughter, Buffie. Rocky's defense strategy was to establish that Nanette had falsely accused her earlier boyfriends of molesting her children.

To fully develop this defense, counsel sought access to Nanette's Department of Children and Family Services (DCFS) records, contending that these would provide specifics of her earlier complaints and perhaps provide additional information to discredit Nanette. Impeaching Nanette would also affect the credibility of Buffie's testimony, since it is clear that Buffie was coached by her

mother. The extent to which Buffie was coached is demonstrated by the following colloquy which occurred during cross-examination of Buffie by defense counsel:

"Q. Well when did Rocky come to the bathroom?

A. The door was locked. He took a screw driver and got in.

Q. So Rocky had a screw driver and you saw the screw driver, is that correct?

A. Yes.

* * *

Q. When did you first see the screw driver?

A. I didn't see but my mom said—

Q. Just a minute, Buffie. Did you or did you not see Rocky with a screw driver?

A. With a screw driver?

Q. Yes.

A. No.

* * *

Q. And the only reason you told everybody that Rocky used a screw driver is only because your mother told you about the screw driver, isn't that correct?

A. Yes."

Clearly, Nanette's credibility was a central issue in the case, and information regarding her previous false accusations—as well as other DCFS information which might establish a motive for such accusations—was relevant and admissible in order to impeach Nanette and cast doubt on Buffie's testimony. See *People v. Hurlburt* (1958), 166 Cal. App. 2d 334, 333 P.2d 82; *People v. Evans* (1888), 72 Mich. 367, 40 N.W. 473; see also *State v. Caswell* (Minn. 1982), 320 N.W.2d 417 (defendant has a constitutional right to impeach with evidence of a prior false accusation).

Balancing the DCFS privilege (Ill. Rev. Stat. 1981, ch. 23, par. 2051 *et seq.*) against defendant's interests in impeaching the State's lead witnesses, a majority of this court accepts the solution adopted by the circuit judge

that he examine the records without benefit of counsel's preparation and advocacy, and then determine which documents are relevant to the defense. This procedure is clearly inadequate, and it does not comport with earlier pronouncements of this court, our rules of procedure, or the decisions of the United States Supreme Court.

In *People v. Dace* (1984), 104 Ill. 2d 96, we accepted the appellate court's ruling that a defendant had the right to inspect the otherwise privileged mental health records of the State's leading witness. (*People v. Dace* (1983), 114 Ill. App. 3d 908.) The appellate court also ruled that the trial court should hold an *in camera* inspection of the privileged records in the presence of the prosecutor and counsel. "This approach balances a defendant's sixth and fourteenth amendment rights with a witness' right to confidentiality ***." (114 Ill. App. 3d 908, 915.) The majority in this case attempts to distinguish *Dace* on the basis that here it is the DCFS which invokes a privilege, not the witness or a private therapist. The distinction lacks merit.

There is no rationale for the majority's rule excluding counsel during *in camera* inspection when the privilege is urged by the State, but allowing the presence of counsel when a witness raises a privilege. The defendant's interests remain unchanged, as does the relevance of the privileged matter to an effective cross-examination, and the State's interest in suppressing the records is certainly no stronger than Nanette's. The State has brought this prosecution and should not now be heard to argue that its collateral interests outweigh defendant's right to confront the witnesses against him. Both *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105, and *People v. Norwood* (1973), 54 Ill. 2d 253, were cases in which the *prosecutor* sought to prevent disclosure of the witness' juvenile records, and those cases hold supreme the interests of the defendant over those

of the witness.

For the defendant to effectively cross-examine a prosecution witness, which "is the principal means by which the believability of a witness and the truth of his testimony are tested" (*Davis v. Alaska* (1974), 415 U.S. 308, 316, 39 L. Ed. 2d 347, 353, 94 S. Ct. 1105, 1110), he must be allowed to compare the witness' testimony against known facts in the possession of the State. In *People v. Norwood* (1973), 54 Ill. 2d 253, this court held that an accused could inquire into the criminal record of a juvenile offender on cross-examination even though the records themselves are protected from disclosure by State law. Since, under *Norwood*, a defendant can inquire into otherwise privileged matter, the defendant must be allowed access to government records so that he can determine whether that witness is honestly responding to cross-examination. (*Cf. Davis v. Alaska* (that counsel could inquire of a witness whether the latter was biased is not sufficient—counsel should have been allowed to expose facts establishing why the witness was biased).) On cross-examination in this case, defense counsel attempted several times to elicit from Nanette the stories of her previous allegedly false accusations, but Nanette responded variously "I don't remember" and "no" she had not made such complaints. Perhaps most damaging to this strategy is that when Nanette began to recall one such occurrence, Rocky's counsel was unable to determine whether Nanette's version was materially different than that recorded by the DCFS. For example:

"Q. Do you remember telling either the doctor or the nurse at St. Elizabeth's Hospital or the police officers that you talked to at that time or the social worker that you talked to—

\* \* \*

Q. —that Angelo Graziano had sexually molested your children and that he had bitten Buffie's arm and

shin?

A. No, I did not. I told them what my children had told me.

Q. So you did not tell them that?

A. I told them that my daughters said they had been molested by Angelo."

So slight a detail may well have been overlooked by the judge during his examination of the DCFS documents. Although counsel might also have dismissed that detail at the time of an *in camera* inspection, when the issue arose he would have had first-hand knowledge of whether Nanette's testimony was at odds with the contents of the DCFS record he had already seen. There is no logical or legal support for the gist of the majority opinion that a trial judge can adequately sift through privileged documents, unaided by the preparation and insight of the attorneys who have developed the case. The judge is not familiar with every nuance of the parties' strategies, and he cannot be expected to vigorously advance defendant's interests from his position of judicial neutrality. *Powell v. Alabama* (1932), 287 U.S. 45, 77 L. Ed. 158, 53 S. Ct. 55 (a judge cannot perform as an effective surrogate for defense counsel).

Sound administration of the judicial system is also sacrificed by the decision of this court. The defendant is put in an untenable position, having to prove prejudice because records in the State's possession, which the defendant has not been allowed to examine, contain relevant information material to his defense. (*People v. Dace* (1983), 114 Ill. App. 3d 908, 915.) To avoid this absurdity, and provide for a record, Supreme Court Rule 415(f) (87 Ill. 2d R. 415(f)) states:

"Upon request of any person, the court may permit any showing of cause for denial or regulation of disclosures, or portion of such showing, to be made *in camera*. A record shall be made of such proceedings. If the court enters

> an order granting relief following a showing *in camera*, the entire record of such showing shall be sealed, impounded, and preserved in the records of the court, to be made available to the reviewing court in the event of an appeal."

The committee notes clearly explain that the purpose of the rule is to develop a record that will protect litigants from error made by a trial court. (87 Ill. 2d R. 415, Committee Comments par. (f).) A showing of cause for the protective order may, according to the rule, "be made *in camera*," and that—of course—presupposes the presence of parties' counsel at the *in camera* proceeding. Because counsel was not present in this case, the rule could not be utilized and no record was made, but this was not a result of a poorly drafted rule. Rule 415(f) was not written to cover proceedings like that employed in this case because it was never intended that a protective order would issue from an inspection of documents without the attendance of opposing attorneys. In fact, I do not understand how it is possible to satisfy the requirement of the rule that a record be made of the *in camera* proceedings when counsel are not even permitted to be present. An erroneous procedure was employed by the trial court, and the majority has endorsed a method by which protective orders are immune to the rigors of appellate review.

My colleagues dismiss the application of Rule 415(f) in this case because the defendant did not request that a record be made and impounded. The answer to the majority argument is contained in the literal language of the rule: once a party requests a protective order (the State in this case) and the court allows an *in camera* proceeding rather than deciding in open court, "[a] record *shall* be made of such proceedings." (Emphasis added.) (87 Ill. 2d R. 415(f).) I construe the word "shall" as mandatory rather than directory; also, as noted

above, it is difficult to understand how a record could have been made once defense counsel's request to be present at the *in camera* proceeding was denied. All defense counsel could have done in this case was what he did—request that the trial court follow mandatory procedures dictated by the rule.

I am also unable to agree with the majority's conclusion finding no actual conflict of interest affecting defendant's attorney. While it is true that the *per se* conflict of interest rule does not apply to attorneys employed by the public defender (*People v. Robinson* (1979), 79 Ill. 2d 147), all the defendant must establish is an actual conflict; prejudice need not be demonstrated. (*People v. Nelson* (1980), 82 Ill. 2d 67.) In my opinion, an actual conflict arose in this case because one member of the public defender's office was trying to establish what another member was attempting to deny. Rocky's defense was that Nanette fabricated this charge to divert attention from her alleged parental failures; at the same time, however, another assistant public defender was arguing on Nanette's behalf before the juvenile court that Nanette Coates was a fit parent.

As I noted above, we have elected to treat public defender's offices under the actual-conflict rule rather than applying a *per se* analysis. In *Robinson* the court set forth the rationale for this decision: the rather slight risk that public defenders will experience prejudicial conflicts is outweighed by the public policy of providing an experienced cadre of criminal defenders. (*People v. Robinson* (1979), 79 Ill. 2d 147, 155-59.) But in those cases where an actual conflict arises, the risk of prejudice increases and the balance shifts. That is why the decision must be made on a case-by-case basis. *People v. Miller* (1980), 79 Ill. 2d 454.

Factors to be considered in a case-by-case analysis include whether counsel's abilities are hobbled or re-

strained by commitments to others (*People v. Washington* (1984), 101 Ill. 2d 104), and whether the "attorney might be subject to subtle influences which could be viewed as adversely affecting his ability to defend his client in an independent and vigorous manner." (*People v. Kester* (1977), 66 Ill. 2d 162, 167.) Those factors are present in this case. Apart from the obviously direct contradiction the office must argue regarding Nanette's fitness as a parent, the situation provided an atmosphere in which Rocky's attorney was subject to "possible perhaps subliminal pressure" not to uncover Nanette's failings before an assistant State's Attorney. (*People v. Fife* (1979), 76 Ill. 2d 418, 424.) No greater showing should be required; otherwise "it would be extremely difficult for an accused to show the extent to which this may have occurred." *People v. Kester* (1977), 66 Ill. 2d 162, 168.

This court has previously found an actual conflict of interest where counsel faced a substantially similar conflict. In *People v. Lackey (per curiam)* (1980), 79 Ill. 2d 466, a proceeding for termination of parental rights, one member of the public defender's office represented the parents while another member represented their child as guardian *ad litem*. In finding an actual conflict where, as here, one assistant public defender was seeking to prove unfitness for parental responsibility while another assistant was trying to deny that allegation, the court said: "Where a conflict of interest between multiple parties clearly appears and separate members of a public defender's staff cannot effectively represent all, other counsel must be appointed." 79 Ill. 2d 466, 468.

Such is this case where the conflict is as clear as it was in *Lackey*. While *Lackey* involved a single court proceeding and this case involves two, that distinction is not controlling. The salient conflict is not that which occurs before the trial judge. Rather, it is the conflict which oc-

curs outside the court—whether at the office, in the attorney's professional relationships, or in his personal life—which need concern this court. (*E.g., People v. Coslet* (1977), 67 Ill. 2d 127 (defense attorney represented victim's estate).) Those conflicts overtly or subliminally affect counsel's motivation and the vigor with which his client's case is presented. (*People v. Fife* (1979), 76 Ill. 2d 418.) Therefore, the fact that the public defender's office was presented with a conflict manifest in two separate courtrooms does not distinguish this case from *Lackey*.

I would remand this case for a new trial at which counsel's motion to withdraw should be granted and the State's request for a protective order would be acted on as directed by *Dace*.